UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JAMES ELMER SHAW,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>DARIN YOUNG, WARDEN; JENNIFER WAGNER, ASSOCIATE WARDEN; ARTHOR ALLCOCK, ASSOCIATE WARDEN; TROY PONTO, ASSOCIATE WARDEN; AL MADSON, UNIT MANAGER; SAM BADURE, UNIT MANAGER; TIM MIEROSE, UNIT MANAGER; CLIFF FANTROY, UNIT MANAGER; DERICK BIEBER, UNIT MANAGER; JACOB GLASER, UNIT COORDINATOR; MARY CARPENTER, M.D. (HEALTH SERVICES); E. R. REGIER, M.D. (HEALTH SERVICES); BRAD ADAMS, PAC (HEALTH SERVICES); and HEATHER BOWER, RN (HEATH SERVICES),<br><br>　　　　　　Defendants. | 4:15-CV-04121-KES<br><br>ORDER REJECTING REPORT AND RECOMMENDATION, GRANTING MOTION TO AMEND, SCREENING SECOND AMENDED COMPLAINT, DISMISSING SECOND AMENDED COMPLAINT IN PART AND DIRECTING SERVICE IN PART, AND DENYING MOTION ON SERVICE |

Plaintiff, James Elmer Shaw, an inmate at the South Dakota State Penitentiary, filed a complaint under 42 U.S.C. § 1983 on July 7, 2013. Docket 1. The matter was referred to Magistrate Judge Veronica L. Duffy pursuant to 28 U.S.C. § 636(b)(1)(B) and this court's October 16, 2014 standing order. Magistrate Judge Duffy screened Shaw's complaint pursuant to § 1915A and recommends dismissing certain defendants and directing service of the complaint on the remainder of the defendants. Docket 14. In response,

Shaw moves to amend his complaint. Docket 19. He also moves to waive the obligation of serving defendants with copies of his complaint. Docket 21. For the reasons stated below, Shaw's motion to amend is granted, the report and recommendation is rejected as moot, Shaw's second amended complaint is dismissed in part under § 1915A and survives screening in part, and Shaw's motion to waive service is denied.

## FACTUAL BACKGROUND[1]

According to Shaw's second amended complaint, Shaw began complaining of pain in his right knee to prison staff in 2004. Docket 19-1 at ¶ 26. Between that time and November 2006, Shaw had an MRI taken of his right knee. *Id.* at ¶ 27. The MRI showed a "tear of the posterior horn of lateral meniscus[,]" a "small Baker's cyst[,]" and a "lesion off of the posterior fibula" in Shaw's right knee. *Id.* at ¶ 28.

Dr. E. Hermanson examined Shaw at the Avera Orthopedic Institute on May 5, 2008, and recommended immediate surgery on Shaw's right knee and better fitting shoes to decrease Shaw's pain. *Id.* at ¶ 29. On May 29, 2008, a physician's assistant at SDSP recommended that Shaw be provided better shoes. *Id.* at ¶ 30. Dr. Eugene Regier denied this recommendation. *Id.* Shaw claims that Department of Corrections (DOC) officials deny requests for shoes because DOC policy now classifies them as "comfort items," even when recommended by health officials. *Id.* at ¶ 34. Prison officials also informed

---

[1] The facts in this section are recited as they appear in Shaw's second amended complaint. Docket 19-1.

Shaw that he would not be allowed to see an orthopedic surgeon because of budget cuts, even though a physician's assistant at the prison had recommended he be seen by an orthopedic surgeon. *Id.* at ¶ 31.

Dr. Zoellner, an orthopedist, recommended surgery and better shoes for Shaw after an August 2, 2009, examination. *Id.* at ¶ 33. This recommendation was also denied. *Id.* On October 9, 2009, another orthopedist recommended surgery for Shaw's right knee. *Id.* at ¶ 36. An orthopedic consultation recommended by a prison physician's assistant was denied without explanation. *Id.* at ¶ 37.

On July 9, 2010, while working in the prison kitchen, Shaw slipped on the wet floor and reinjured his right knee. *Id.* at ¶ 38. Shaw was in extreme pain and went to health services. *Id.* He was given crutches and a medical order that he not work for seven days. *Id.* His knee was x-rayed at sick call the next day. *Id.*

In an examination on August 24, 2011, Shaw complained to Dr. Regier that his right knee was locking up and causing him pain and that his left knee was causing him pain because he was favoring it. *Id.* at ¶ 39. During that examination, Shaw learned of Dr. Hermanson's recommendation for surgery for the first time. *Id.* Dr. Regier did not respond when Shaw asked him why the recommendation had not been followed. *Id.* Dr. Regier requested another orthopedic consultation, which was denied by Health Care Management Technologies, Inc. (HCMTI), the entity responsible for responding to requests

3

for medical treatment at that time. *Id.* at ¶¶ 25, 39. According to the second amended complaint, in order for recommendations to be granted, Dr. Regier needed to make two requests, which he failed to do. *Id.* at ¶¶ 39, 40.

On November 1, 2011, while working in the prison kitchen, Shaw slipped on the wet floor again, reinjuring his right knee and injuring his left knee. *Id.* at ¶ 41. In December 2011, Dr. Regier requested an MRI for Shaw's right knee. *Id.* at ¶ 43. Dr. Mary Carpenter denied this request. *Id.* Audrey Shedd, head nurse at the Jameson Annex where Shaw was incarcerated at the time, allegedly told Shaw's Unit Coordinator (UC) that Shaw was denied *any* treatment for his right knee. *Id.* at ¶¶ 44, 45. Shedd issued a medical order on July 12, 2012, stating that ice provided under prior medical orders would be considered a "comfort item" and was no longer medically necessary. *Id.* at ¶ 47.

At sick call, on August 11, 2012, Shaw received another recommendation for ice and a pillow to elevate his knee. *Id.* at ¶ 48.

In October 2012, Shaw's knee was x-rayed again. *Id.* at ¶ 50. Following a recommendation by Dr. Regier, an MRI was taken of Shaw's knee, and it revealed a new ligament tear, a new medial meniscus posterior horn tear, increased cartilage defects, and a Baker's cyst. *Id.* When these findings prompted another request for surgery, Dr. Carpenter denied the request. *Id.*

On June 14, 2013, Dr. Jeffrey Kalo operated on Shaw's right knee.[2] *Id.* at ¶ 51. After surgery, Dr. Kalo told Shaw that his ACL was irreparable, he would

---

[2] Shaw's second amended complaint does not allege that a prison health

never walk as he did before, and he would be in pain for the rest of his life because of the delay in surgery. *Id.* at ¶ 52. Nurses at JPA ordered that Shaw use an exercise bike, medical ice, and a pillow to aid his healing. *Id.* at ¶ 53. These medical orders were renewed until he was transferred to SDSP when Heather Bowers, Head Nurse at SDSP, denied these requests because she was skeptical that Shaw needed them. *Id.*

Shaw was given a knee brace for his right knee. *Id.* at ¶ 54. He complained to nurses at SDSP on September 3, 2013, and requested the brace be adjusted. *Id.* Dr. Carpenter denied this adjustment because it was cost prohibitive, which made the brace useless to Shaw and debilitated him. *Id.*

On February 24, 2014, Dr. Carpenter issued a memo stating that special shoes, medical showers, and pillows were considered non-medical items and requests for them would be decided by DOC staff members rather than contracted medical providers. *Id.* at ¶ 55.

An x-ray on May 8, 2014, showed degeneration of Shaw's left knee joint. *Id.* at ¶ 56. An MRI in August of 2014 revealed a chronically torn ACL and cartilage damage to Shaw's left knee. *Id.* at ¶ 57. A nurse at SDSP reviewed the MRI results, said that surgery was necessary, and submitted a request on August 28, 2014, for an orthopedic consultation. *Id.* at ¶ 58. On September 16, 2014, a nurse told Shaw that Dr. Carpenter denied the orthopedic consultation because of budget cuts. *Id.* On December 11, 2014, the request for an

official ever granted him permission to have surgery.

orthopedic consultation was resubmitted, but Dr. Carpenter denied it again. *Id.* at ¶ 59.

On March 9, 2015, Dr. Kalo performed an arthroscopy on Shaw's left knee. *Id.* at ¶ 60. He found, however, that reconstruction of Shaw's ACL was impossible due to the delay in conducting the procedure and that Shaw would have to live with pain until he could get a knee replacement when he was about 60 years old. *Id.* Dr. Kalo recommended that Shaw elevate and ice his knee until the pain and swelling subsided. *Id.*

On March 9, 2015, Shaw asked UC Jacob Glaser to move him to a cell for handicapped inmates because Shaw could not get in and out of the bunks in a normal cell. *Id.* at ¶ 61. Glaser told Shaw he would have to move other inmates to accommodate this request even though there was an empty, handicap accessible cell. *Id.* at ¶ 62. Glaser told the other inmates that they could "thank Shaw" for the move. *Id.* at ¶ 63. Shaw believed this put him in danger of retribution, which was made worse by the fact that his knee injury already made him vulnerable to attack. *Id.* at ¶¶ 62, 63. The other inmates threatened Shaw. *Id.* at ¶ 63. Because of this and to avoid being assaulted, Shaw refused housing and was sent to the Segregated Housing Unit (SHU). *Id.* at ¶ 64.

In the SHU, Shaw was denied water, ice, his medication, his crutches, and a blanket and was told by a correctional officer that Unit Manager (UM) Al Madsen had instructed them not to give Shaw anything. *Id.* at ¶¶ 65, 66. When

6

Shaw asked Madsen the reason for the treatment, Madsen said "It sucks to get your way all the time, doesn't it?" and walked away. *Id.* at ¶ 67.

On March 11, 2015, Shaw was released from the SHU, and UM Sam Badure told him he would have to move cells with his cellmate. *Id.* at ¶ 68. This was the same situation Shaw previously refused. *Id.* When he told Badure he would be attacked and he was vulnerable, she responded "You'll have to deal with that if it arises." *Id.* at ¶ 69. Shaw again elected to go to the SHU. *Id.*

Later on March 11, 2015, Shaw requested medical ice, which his doctor had ordered, and a change of bandages. *Id.* at ¶ 73. The correctional officer in the SHU told him that he could go to sick call the next day. *Id.* There, he received ice, but Shedd refused to give him a pillow or change his bandage. *Id.* at ¶ 75. He also requested the pain medication Dr. Kalo prescribed to him after surgery but was told that Shedd did not believe he needed medication because the surgery was not that serious. *Id.* at ¶ 76. Prison medical officials told him he needed to "man up." *Id.* On March 13, 2015, at sick call, Shaw's bandage was changed. *Id.* at ¶ 77.

On March 16, 2015, Shaw went to Associate Warden Troy Ponto's office and explained that he could not stay in the cell he was in because he could not get into the bed and was sleeping on the floor. *Id.* at ¶ 78. Ponto told Badure to move Shaw to the empty handicap accessible cell. *Id.*

Shaw complained to prison medical officials that his knee was infected because of lack of treatment post-surgery. *Id.* at ¶ 79. On March 18, 2015,

Dr. Kalo examined him, recommended anti-biotics, and extended his prescription for pain medication. *Id.* at ¶ 80.

Around the beginning of April, Shaw was transferred from JPA to SDSP proper. *Id.* at ¶ 81. Shaw had trouble taking showers because prisoners must walk down steps to get to the showers in the East Hall of SDSP. *Id.* at ¶ 83. East Hall has medical showers that are on the ground floor and are only a short walk from Shaw's cell. *Id.* At sick call, he asked for permission to use the medical showers and an order that he not be forced to use the stairs, but the request was denied by Bowers. *Id.* at ¶¶ 44, 84, 85.

On May 1, 2015, an employee of Orthotic & Prosthetic Specialties (O&P) fit Shaw with a brace for his leg. *Id.* at ¶ 86. Shaw was unhappy with the caliber of brace and claims that it never fit properly and caused him pain rather than providing him support. *Id.* Three days later, he complained to Bowers, who sent him back to O&P to adjust his brace. *Id.* at ¶ 87. He went back to O&P, but the employee's attempt to adjust the brace did not help. *Id.* When he asked Bowers to allow him to go back to O&P a third time, she refused. *Id.*

On May 10, 2015, Shaw slipped in the shower, injuring his left shoulder, left elbow, and back. *Id.* at ¶ 88. He complained of these injuries at sick call. *Id.* at ¶ 89. Because he was not receiving treatment for his injuries, he wrote to Dr. Kalo, Warden Darin Young, Dr. Regier, and UM Bieber, telling them that he was in pain and suicidal. *Id.* at ¶ 90.

8

Shaw was again denied a no-stair order by Bowers and UM Derick Bieber. *Id.* at ¶ 91. Shaw asked that Bieber put him in the SHU because he would not have to walk up and down stairs to get to the shower. *Id.* at ¶ 92. Shaw was put in the SHU, and he went on a hunger strike. *Id.* at ¶ 93. After four days of refusing food and water, Shaw was called into Dr. Regier's office. *Id.* at ¶ 94. Shaw explained his actions and threatened to sue the prison. *Id.* Dr. Regier told him things would be worse if Shaw sued, and told him if he stopped his hunger strike, he would get a no-stair order. *Id.* Shaw agreed. *Id.*

On October 28, 2015, Shaw met with Dr. Regier and Bowers. *Id.* at ¶ 96. Shaw described the pain he was suffering, and Dr. Regier told Bowers to make appointments for Shaw to see an orthopedist and a neurologist as soon as possible. *Id.* An orthopedic consultation was scheduled, but Bowers decided to see what the orthopedist said before scheduling a neurology consultation. *Id.* at ¶¶ 97, 98.

On November 17, 2015, Shaw had an appointment at CORE Orthopedics where they changed his medication, gave him a cortisone shot in the right knee, requested x-rays and a follow-up, and recommended Shaw see a neurologist for his back pain. *Id.* at ¶ 99. Two days later, correctional health services x-rayed Shaw's knees and lower back. *Id.* at ¶ 100.

In May 2015, Shaw began trying to review his medical records. On May 6, 2015, he was told by the SDSP medical records department that he could review his records in a couple weeks but some of his records would be

withheld, including records from outside providers. *Id.* at ¶ 119. Then he was told he could not review these records because he did not have the funds to pay the fee. *Id.* at ¶ 120. In June 2015, Bowers denied Shaw's requests for copies of DOC policies and medical reports from outside providers and prison officials. *Id.* at ¶¶ 122, 123. Shaw complained to Glaser about these denials, but Glaser did nothing. *Id.* at ¶ 124.

When Shaw was examined at CORE Orthopedics, he asked them to send him his medical records, and they agreed. *Id.* at ¶ 99. On November 18, 2015, he requested that the prison give him his mail from CORE. *Id.* at ¶ 126. He was called into correctional health services two days later and given his October 1, 2015 records from Avera. *Id.* at ¶ 127.

Shaw went to sick call on November 23, 2015, and asked the nurse assessing him about his neurological consultation. *Id.* at ¶ 102. She did not respond. *Id.* He also asked to see the files concerning his knee treatment and request for better shoes. *Id.* at ¶ 128. The nurse left to ask Bowers. *Id.* When the nurse returned, she told Shaw that there was neither a request nor a denial on file for these treatments. *Id.* Shaw said he had the recommendations from Avera but was never given the treatment, so they must have been denied. *Id.* He told the nurse he needed the information to write his complaint. *Id.* When Shaw explained to her what he was putting in his complaint for this lawsuit, she became mad and ended the assessment. *Id.*

Later that day, Bowers ordered a shakedown of Shaw's cell. *Id.* at ¶ 103. She alleged that Shaw stole medical records during his sick call and ordered that he be sent to the SHU. *Id.* A correctional officer came to Shaw's cell and asked him the location of the stolen medical records. *Id.* at ¶ 146. Shaw was taken to a medical holding cell and strip searched. *Id.* The medical records Shaw had in his cell were confiscated along with numerous other belongings, including his legal documents. *Id.* at ¶ 129. Fifteen minutes later, the correctional officer returned and gave Shaw a folder that had been emptied of the medical records sent to him by Avera. *Id.* at ¶ 148. He was sent to the SHU later that day for investigative purposes. *Id.* at ¶ 149. He was not served with a disciplinary report or charged with a rule infraction. *Id.*

In the SHU, Shaw asked for medical treatment. *Id.* at ¶ 104. The correctional officer smirked at him and refused, telling Shaw that Bowers stopped his medical treatment. *Id.* at ¶¶ 104, 105. After three days in the SHU, Shaw's back spasmed, he fell and injured his back, elbow, shoulder, and neck. *Id.* at ¶ 106. He asked for help but was told to wait four more days and go to sick call. *Id.* Since this fall, Shaw's lower back has been in constant pain. *Id.*

On December 1, 2015, he was returned to East Hall after eight days in the SHU. *Id.* at ¶ 107. His legal papers and medical records were all gone. *Id.* at ¶ 150. According to DOC policy, prison officials should have charged him with a violation or talked to him about the investigation before searching his cell, confiscating his possessions, and sending him to the SHU. *Id.* at ¶ 152.

11

On his way to sick call the next day, Shaw's back spasmed again, and he fell to the ground. *Id.* at ¶ 108. CO Perrett, the correctional officer who was escorting Shaw to sick call, yelled at him to get up and taunted him while he was on the ground. *Id.* Down the hallway came Young, Ponto, and Bieber, and they heard what Perrett had said. *Id.* Ponto told Perrett to get a wheelchair for Shaw. *Id.*

At sick call, Shaw waited three hours to be seen. *Id.* at ¶ 109. Eventually, a nurse came and told him that they were not seeing any more patients that day and that Bowers and Dr. Regier had decided he did not need the wheelchair. *Id.* Shaw was allowed to use the wheelchair to return to East Hall. *Id.* Once he got back, CO Perrett angrily confronted Shaw, telling him to get out of the chair. *Id.* at ¶ 111. Another correctional officer intervened, saying they should let Shaw use the wheelchair to get back to his cell. *Id.* CO Perrett relented, but told Shaw that he would not get away with making him look bad in front of the warden. *Id.*

On December 2, 2015, Shaw met with Ponto and Bowers. *Id.* at ¶ 112. He complained that he had suffered eight months of back pain without seeing a neurologist and that Bowers was telling people he was faking his pain to get drugs. *Id.* at ¶¶ 112, 113. Bowers said he was scheduled to see a provider within the next week or two. *Id.* at ¶ 114.

Apparently at this same meeting, Ponto questioned where Shaw got the medical records he was sent to the SHU for stealing. *Id.* at ¶ 154. Shaw tried to

explain but was interrupted. *Id.* Because of Ponto's reaction to his explanation, Shaw believed Ponto had already made up his mind, so Shaw adopted an apologetic manner and said as little as possible. *Id.* He asked Ponto when he could get the records back. *Id.* Ponto said he could get them back within a week, but they had to go through them first to see what was there. *Id.* His property was returned to him, but he was missing law books, cases, medical records, notes, a draft of his complaint, a declaration of a prison staff member, and art supplies. *Id.* at ¶ 155, 156.

On December 7, 2015, the medical records clerk sent Shaw a note that said he would have orthopedic consultation for his back in 1-4 months. *Id.* at ¶ 115. As of the second amended complaint, Shaw still had not seen a specialist for his back. *Id.* at ¶ 118. Because of his lack of treatment, he has been in pain and has had to skip recreational time for the past six months. *Id.* at ¶¶ 117, 118.

While Shaw received limited access to his medical records, it did not include any responses to requests for treatment or responses to recommendations from outside consultants. *Id.* at ¶ 132. Shaw never received the medical records that were sent by Avera. Correctional health services called him on December 14, 2015, and told him that the records were "lost or destroyed," gave him a copy of the November 17 examination notes, and told him he would have to ask Avera directly if he wanted more copies. *Id.* at ¶ 159.

13

Shaw wrote to Ponto, Young, and Kaemingk, telling them his property was taken and asking for their help to get it back. *Id.* at ¶ 160.

Throughout this time, Shaw also had trouble with legal assistance at SDSP. According to the second amended complaint, Delmar "Sonny" Walter is an attorney who works at the Inmate Legal Assistance Office (ILAO) at SDSP, providing legal assistance to inmates, and Mark Bidne, a paralegal, is his assistant. *Id.* at ¶¶ 134, 135. When Shaw requested help with his legal matters, Bidne said that he was only able to provide case law and responded to a list of specific requests with generally unhelpful or unrelated responses. *Id.* at ¶¶ 138, 139. Bidne is the only person offering assistance in SDSP. *Id.* at ¶ 143. Shaw wrote a letter to Kaemingk, Young, and Ponto claiming that this assistance is inadequate and asking for an investigation into the matter. *Id.* at ¶ 142.

Shaw filed his original complaint on July 13, 2015. Docket 1. He amended his complaint on August 12, 2015. Docket 8. He intended his first amended complaint to supplement rather than supersede his original complaint. Docket 19 at ¶ 2. The court, however, construed it as an amended complaint and considered the original complaint superseded. Docket 14 at 1-2 n. 1.

In his amended complaint, Shaw raised a single claim: defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment prohibition against cruel and unusual punishment. *Id.* Magistrate

Judge Duffy screened the amended complaint and recommends dismissal of the defendants named in their supervisory roles only, namely: Young, Deputy Warden Jennifer Wagner, Associate Warden Arthur Allcock, Ponto, UM Tim Mierose, UM Cliff Fantroy, Bieber, Brad Adams, PAC, and Bowers. Docket 14 at 14-15.

In lieu of objections to the report and recommendation, Shaw filed a second amended complaint. Docket 19. His second amended complaint raises four claims. Docket 19-1. As stated by Shaw, they are:

(1) [P]rison officials and employees of the State health care system did cause Plaintiff Shaw pain, suffering, loss of sleep, and permanent injury when they denied Shaw essential and/or human [sic] medical care in a timely manner;

(2) State health care employees denied Shaw access to medical records and health care policies necessary to the preparation of his claims;

(3) [A] contracted attorney and paralegal, as allowed by SDSP officials and the Secretary of the SD Department of Corrections (DOC), those responsible to provide basic legal assistance at SDSP, did deny Shaw the ability to conduct the research necessary to prepare valid legal claims based upon provisions of the Americans with Disabilities Act (ADA) and current case law on denials of incoming mail;

(4) [D]efendants caused to be seized and subsequently have kept from Plaintiff medical records and legal papers necessary to prepare these claims and those not yet prepared, and read Plaintiff's legal papers so as to gain unfair advantage in these proceedings and in those not yet prepared.

Docket 19-1 at 1-2.

Shaw names as defendants Madson, Glaser, Badure, Bieber, Dr. Regier, Dr. Carpenter, Shedd, Bowers, Walter, Bidne, Ponto, Young, Kaemingk, Perrett, and Anderson. Docket 19-1 at ¶¶ 5-19. In his second amended complaint, he

15

attempts to rectify the vicarious liability issues raised in the report and recommendation. Docket 19 at ¶¶ 7, 8.

Shaw also moves the court to waive his obligation to serve paper copies of his pleadings upon defendants. Docket 21. He argues that he does not have the resources to fulfill this obligation and that defendants can access his pleadings via CM/ECF. *Id.* at ¶¶ 1-3.

## LEGAL STANDARD

The court must accept the well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014). Civil rights and pro se complaints must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted); *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004). Even with this construction, "a pro se complaint must contain specific facts supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *Ellis v. City of Minneapolis*, 518 F. App'x 502, 504 (8th Cir. 2013). Civil rights complaints cannot be merely conclusory. *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993); *Parker v. Porter*, 221 F. App'x 481, 482 (8th Cir. 2007).

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "If a plaintiff cannot make the requisite showing, dismissal is

16

appropriate." *Abdullah v. Minnesota*, 261 F. App'x 926, 927 (8th Cir. 2008); *Beavers v. Lockhart*, 755 F.2d 657, 663 (8th Cir. 1985).

28 U.S.C. § 1915A requires the court to screen prisoner complaints and dismiss them if they are "(1) frivolous, malicious, or fail[] to state a claim upon which relief may be granted; or (2) seek[] monetary relief from a defendant who is immune from such relief." 1915A(b).

## DISCUSSION

Shaw moves to amend his complaint, Docket 19, and to waive his obligation of service. Docket 21. Because the court grants Shaw's motion to amend, his second amended complaint must be screened pursuant to § 1915A.

## I. Shaw's Motion to Amend Is Granted

Shaw moves to amend his complaint in order to add defendants, add claims, and rectify the deficiencies noted by Magistrate Judge Duffy in her report and recommendation. After its first amendment, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Because defendants have not been served and Shaw's amendments would rectify some of the deficiencies in the first amended complaint, the court grants Shaw's motion to amend.

## II. Screening Pursuant to § 1915A

Shaw's second amended complaint raises four claims: denial of necessary medical care, denial of access to his medical records, denial of

17

access to the courts because of the inadequate prison attorney, and denial of his rights due to the seizure and destruction of his medical records and legal papers that are necessary to raise his claims in federal court. Docket 19-1 at 1-2.

## A.    Claim 1: Denial of Necessary Medical Care

Shaw alleges that Madson, Glaser, Badure, Regier, Carpenter, Shedd, Bowers, Anderson and Parrett were deliberately indifferent to his serious medical needs. The Eighth Amendment prohibits cruel and unusual punishment including prison officials' deliberate indifference to the medical needs of inmates. *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015). "[D]eliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05.

To state an Eighth Amendment claim, plaintiffs must show "a substantial risk of serious harm to the victim," and "that the prison official was deliberately indifferent to that risk of harm . . . ." *Letterman v. Does*, 789 F.3d 856, 861-62 (8th Cir. 2015) (citing *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). Shaw alleges that his injuries have caused him

18

extreme pain have caused other problems such as physical disability and a diminished mental state. Docket 19-1 at ¶¶ 117-18. Thus, Shaw satisfies the first prong under *Letterman*.

Shaw must also show that defendants were deliberately indifferent to this harm. "The deliberate indifference element has two components: an actor must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety.' " *Letterman*, 789 F.3d at 862 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To show that defendants knew of the substantial risk of serious harm, Shaw does not need to show actual knowledge, the court "can infer knowledge if the risk was obvious." *Id.* It is enough to show that the defendant "had been exposed to information concerning the risk and thus 'must have known' about it." *Id.* (quoting *Farmer*, 511 U.S. at 842).

Shaw alleges that defendants knew of the risk of harm. As medical personnel at the prison, Dr. Regier, Dr. Carpenter, Shedd, and Bowers were all made aware of Shaw's injuries when he requested treatment for these injuries. Further, medical professionals outside the prison also affirmed this risk in their examinations and recommendations for treatment. Shaw also made the non-medical prison officers aware of the risk of harm. He requested accommodation for his injuries from Glaser and Badure. Madson ordered correctional officers in the SHU to refuse his accommodations. Anderson and Parrett witnessed his inability to walk to sick call on his own. Defendants were aware of the risk of harm to Shaw.

Shaw also "must show the official 'knew that their conduct was inappropriate in light of' the risk to the prisoner." *Id.* (quoting *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009)). "Knew" in this context means more than negligence and is "akin to the criminal rule of 'recklessness.' " *Id.* (quoting *Farmer*, 511 U.S. at 839-40).  "Generally, the actor manifests deliberate indifference by 'intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed.' " *Id.* (quoting *Krout*, 583 F.3d at 567). Shaw alleges that the denials of treatment by both medical and non-medical prison personnel were intentional either because they did not believe he should receive treatment when he clearly should or because adequate treatment would be administratively difficult. Shaw's Eighth Amendment claim survives initial review under § 1915A.

Shaw fails to state a claim against Perret and Anderson. While they were aware of Shaw's pain, they were not in a position to offer adequate health care or proper accommodations. At worst, these defendants taunted Shaw and denied him a wheelchair for an insignificant amount of time before Ponto ordered them to provide him one. This is not sufficient to state a deliberate indifference claim. Therefore, this claim against Perret and Anderson is dismissed without prejudice.

20

**B.      Claim 2: Denial of Access to Medical Records**

Shaw alleges that Glaser, Carpenter, and Bowers denied him access to his medical records. He does not state clearly what right this denial infringes upon. He alleges that without his medical records he cannot raise claims that he is being denied medical treatment, Docket 19-1 at ¶¶ 119, 122, and he claims that his medical records that were sent to him through the mail are being confiscated by defendants. *Id.* at ¶ 133. The court construes these claims to be a claim for denial of access to the courts and a claim for denial of the right to receive mail.

At the outset, the court points out that Shaw's medical files are not legal files merely because he means to file a lawsuit based on the information in these files. Shaw was sent medical files by his doctor, not his attorney. Therefore, his mail is not legal mail, nor constitutionally protected as such.

**1.     Access to the Courts**

Shaw fails to state a claim that he was denied access to the courts. "The Constitution guarantees prisoners a right to access the courts." *White v. Kautzky*, 494 F.3d 677, 679 (8th Cir. 2007).

> To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.

*Id.* at 680. "To prove actual injury, [a prisoner] must 'demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded.' " *Id.* (quoting *Lewis v. Casey*, 518 U.S. 343, 353 (1996)).

Shaw does not show actual injury. His second amended complaint alleges the Eighth Amendment claim discussed above and the First Amendment claim discussed below. He has brought these claims to this court; therefore, he was not denied access. Shaw's access to the court claim is dismissed without prejudice as to all defendants.

### 2.    Right to Receive Mail

Shaw claims he was denied the right to receive mail. "[I]t is well settled that inmates have a right to receive mail . . . ." *Weiler v. Purkett*, 137 F.3d 1047, 1050 (8th Cir. 1998). Shaw alleges that his doctors outside the prison sent him his medical records, but defendants confiscated these records and did not return them. While it is true that the right to receive mail "may be limited by prison regulations that are reasonably related to legitimate penological interests[,]" *id.* (citing *Turner v. Safley*, 482 U.S. 78, 92 & 89 (1987)), defendants must show that the denial of Shaw's medical records is related to such an interest. *See Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir. 1999) (prisoner's allegations that he was denied magazines obligated the prison to proffer a legitimate reason for denying these materials). Because the court is unaware of whether a legitimate penological reason exists for the confiscation

of the medical records, this claim survives screening as to Glaser, Carpenter, and Bowers.

### 3.    Violation of Prison Policies

Shaw also alleges that defendants violated prison policy by denying him access to copies of DOC mail policies. Docket 19-1 at ¶ 122. To the extent Shaw attempts to state a claim based on this denial, he fails. "[T]here is no § 1983 liability for violating prison policy." *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997); *Moore v. Rowley*, 126 F. App'x 759, 760 (8th Cir. 2005). Therefore, this claim is dismissed without prejudice.

### C.    Claim 3: Denial of Adequate Legal Research

Shaw claims that Walter, Bidne, Ponto, Young, and Kaemingk denied him access to the court because the ILAO at SDSP is inadequate. To show a denial of access to the courts, Shaw must show actual injury as a result of the alleged inadequacy of the legal assistance office. *See White*, 494 F.3d at 680. Shaw alleges that he was injured because the alleged inadequacy of the ILAO made him unable to prepare and raise numerous claims. Docket 19-1 ¶ 144.

Shaw does not show actual injury. The actual injury threshold is high. *See Hartsfield v. Nichols*, 511 F.3d 826 (8th Cir. 2008) (Explaining that being actually prevented from filing a complaint or having a complaint dismissed for "lack of legal adequacy" constitutes actual injury); *Klinger v. Dep't of Corr.*, 107 F.3d 609, 617 (8th Cir. 1997) (A claim of "complete and systemic denial of access to a law library or legal assistance" failed because none of the inmates

"suffered actual injury or prejudice as a result of that denial of access"); *Sabers v. Delano*, 100 F.3d 82, 83 (8th Cir. 1996) (same).

The Eighth Circuit Court of Appeals has found that an inmate could show actual injury when he was denied relief under a state habeas petition because he was prevented from obtaining meaningful access to the law library to prepare a reply brief. *McCauley v. Dormire*, 245 F. App'x 565, 566 (8th Cir. 2007). As support, the Court cited the Seventh Circuit Court of Appeals decision in *Marshall v. Knight*, 445 F.3d 965, 968-69 (7th Cir. 2006), which found actual injury when an inmate was denied access to the prison library, and as a result, he lost good time credits because he was unable to research and prepare for his court hearing. *Id.*

The Court, however, has specifically found that not knowing what arguments to make is not enough to show actual injury. *Hartsfield*, 511 F.3d at 832. That is the essence of Shaw's claim. He did not raise these other claims because he was not sure how to argue them, even though he knew the factual situation surrounding them. Like *Hartsfield*, Shaw's allegation that his claims "would have been insufficient is speculative," and dismissal is proper. A 49-page complaint is unnecessary. Shaw could have raised these complaints by merely presenting a short, plain statement of the facts. Therefore, Shaw's claim is dismissed without prejudice.

24

### D.    Seizure of Legal Papers

Shaw alleges that Bowers, Ponto, Young, and Kaemingk violated his constitutional rights by seizing and failing to return his legal documents. Docket 19-1 at ¶ 166. Shaw claims his right to be free from illegal searches and seizures, his right to access the courts, his right to due process, and his right to equal protection were violated by these actions. *Id.*

### 1.    Defendants

Shaw names Young and Kaemingk as defendants because he wrote to them after his property was taken and requested assistance in getting it back, and they refused. *Id.* at ¶ 160. At most, he argues that Young and Kaemingk failed to respond to his grievance. "Failure to process or investigate grievances, without more, is not actionable under § 1983." *Thomas v. Banks*, 584 Fed. Appx. 291 (8th Cir. 2014); *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993).

Shaw does not allege Young or Kaemingk were involved in the seizure of his legal papers other than to allegedly fail to respond to his request. "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Because Shaw does not allege Young and Kaemingk were involved in the seizure or retention of his documents, the claims against them are dismissed without prejudice.

25

### 2.    Search and seizure

Shaw claims that defendants violated his Fourth Amendment rights by searching his cell and seizing his legal documents. The Fourth Amendment, however, is not applicable to prison cells. *Bausley v. Dugan*, No. 04-2642, 2004 WL 2291373, at *1 (8th Cir. Oct. 13, 2004); *Hudson v. Palmer*, 468 U.S. 517, 525-36 (1984). Therefore, Shaw fails to state a claim that defendants violated his rights under the Fourth Amendment.

### 3.    Access to courts

Shaw also claims that defendants denied him access to the court by confiscating and destroying his legal documents. The Eighth Circuit Court of Appeals has found that prisoner plaintiffs successfully stated similar claims. *See Goff v. Nix*, 113 F.3d 887 (8th Cir.1997) (prisoners had standing to bring claim that legal papers were taken without permission); *Waff v. S. Dakota Dep't of Corr.*, 51 F. App'x 615, 617 (8th Cir. 2002) (prisoner stated a claim by alleging that prison officials confiscated, lost, and destroyed his legal materials). In *Goff*, however, the plaintiffs alleged an actual injury: being deprived of legal material that was critical to a post-conviction proceeding.

Shaw does not allege an actual injury to support his access to the court claims. He states that the confiscation of his legal documents caused unnecessary delay in bringing his claims or the inability to bring them at all. Docket 19-1 at ¶ 153. His example, however, is that defendants confiscated his second amended complaint. *Id.* But, he has filed his second amended

26

complaint. He was not denied access to the courts. Therefore, he has not shown actual injury, and his claim is dismissed without prejudice.

### 4.    Due Process

Shaw claims that defendants violated his due process rights by confiscating and destroying his legal documents. He does not explain how his due process rights have been violated. He also states in his second amended complaint that he was given a hearing on the matter in which he could explain his actions and defend himself. Docket 19-1 at ¶ 154. Ponto told Shaw that the defendants needed to go through the confiscated materials and determine what could be returned. *Id.* After this, some of his materials were returned. *Id.* at ¶ 155. Shaw fails to show that he was denied due process. Therefore, his claim is dismissed without prejudice.

### 5.    Equal Protection

Shaw claims that defendants violated his equal protection rights. He alleges that defendants treated him differently than others when they confiscated his legal documents. *Id.* at ¶ 153. He offers nothing more than the bald statement that this is different than the treatment others receive. He does not describe why defendants purposefully treated him differently than others, the foundation of an equal protection claim. *See Robbins v. Becker*, 794 F.3d 988, 995 (8th Cir. 2015) (quoting *Batra v. Bd. of Regents of Univ. of Neb.*, 79 F.3d 717, 721 (8th Cir. 1996) ("Unequal treatment of 'those who are entitled to be treated alike[ ] is not a denial of equal protection unless there is shown to be

27

present in it an element of intentional or purposeful discrimination' ")). Therefore, he fails to state an equal protection claim, and his claim is dismissed without prejudice.

### 6.    Violation of Prison Policy

Shaw claims that defendants violated prison policy by searching his cell and putting him in the SHU without charging him with a rule violation or discussing their investigatory reasons for housing him in the SHU. Docket at ¶ 152-53. To the extent that Shaw attempts to state a claim based on this violation of prison policy, he fails. "[T]here is no § 1983 liability for violating prison policy." *Gardner*, 109 F.3d at 430; *Moore*, 126 F. App'x at 760. Therefore, this claim is dismissed.

### 7.    Retaliation

Shaw claims that defendants retaliated against him for attempting to file this lawsuit against them. In order to demonstrate retaliation in violation of the First Amendment under 42 U.S.C. § 1983, Shaw must "show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cty. Mo.*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). "The retaliatory conduct itself need not be a constitutional violation; the violation is

acting in retaliation for 'the exercise of a constitutionally protected right.' " *Id.* (quoting *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001)).

Shaw states a claim of retaliation. He alleges that the defendants searched his cell and confiscated his legal documents in an attempt to prevent him from bringing the claims he has raised in his second amended complaint and to punish him for filing this lawsuit. *Id.* at ¶ 153. He claims that he raised the issue of his amended complaint to a nurse at health services on November 23, 2015. *Id.* at ¶ 145. Later that day, he claims that his cell was searched for "stolen medical records." *Id.* at ¶ 146. Among the documents not returned to Shaw were documents from his lawsuit, such as his second amended complaint. *Id.* at ¶ 153. It is not apparent why these documents would be confiscated. The correctional officer searching Shaw's cell was overheard wondering what Shaw had done to provoke Bowers into ordering his cell to be shaken down. *Id.* at ¶ 157. In his disciplinary hearing, neither Bowers nor Ponto seems to have explained anything about his legal documents, even though they were not returned with the rest of his belongings. *Id.* at ¶¶ 154, 155. Shaw states a claim that Bowers and Ponto searched his cell and confiscated his legal documents in retaliation for exercising his constitutional rights.

### III.    Motion on Service

Shaw moves the court to waive his obligation to serve the defendant with physical copies of his second amended complaint. Docket 21. He claims that he

is indigent and therefore has an allotted amount of paper from the prison, and it is not enough to print multiple copies of his 49-page complaint. *Id.* at 1.

The court granted Shaw in forma pauperis status. Docket 7; Docket 13. If he fills out and returns the summons, officers of the court will serve the second amended complaint for him. *See* 28 U.S.C. § 1915(d). There is no need for him to provide copies of his second amended complaint. Therefore, his motion is denied.

### CONCLUSION

Shaw moves to amend his complaint for a second time. Docket 19. The court grants this motion and screens his complaint under 28 U.S.C. § 1915A. Because this second amended complaint supersedes his first amended complaint, Magistrate Judge Duffy's report and recommendation is rejected as moot.

Shaw's second amended complaint raises four claims. In Claim 1, Shaw alleges that he was denied necessary medical care. The court finds that this claim survives screening. Shaw fails to state a claim against Perret and Anderson, however, and they are dismissed.

In Claim 2, Shaw alleges that he was denied access to his medical records. Construed as a right to receive mail claim, the court finds that this claim survives screening.

In Claim 3, Shaw alleges that the ILAO at SDSP is inadequate and causes his right to access the court to be violated. Because he does not show

30

actual injury, this claim is dismissed. Defendants Walter and Bidne are dismissed because this is the only claim raised against them.

In Claim 4, Shaw alleges that defendants seized his legal documents. The court dismisses defendants Young and Kaemingk because they were only named as defendants in their supervisory capacities. Construed as a retaliation claim, the court finds that Shaw states a claim against Bowers and Ponto. It is ORDERED

1. Magistrate Judge Duffy's report and recommendation (Docket 14) is rejected as moot.

2. Shaw's motion to amend (Docket 19) is granted.

3. Shaw's claim that he was denied medical care (Claim 1), his claim that he was denied the right to receive mail (Claim 2), and his claim that defendants retaliated against him (Claim 4), all in his second amended complaint (Docket 19-1), survive screening under 28 U.S.C. § 1915A.

4. The remainder of Shaw's claims are dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

5. Defendants Perret, Anderson, Walter, Bidne, Young, and Kaemingk are dismissed.

6. Shaw's motion on service (Docket 21) is denied.

7. The Clerk shall send blank summons forms to Shaw so he may cause the summons and second amended complaint (Docket 19-1) to be served upon the defendants.

8. The United States Marshal shall serve a copy of the second amended complaint (Docket 19-1), Summons, and this Order upon defendants Madson, Glaser, Badure, Ponto, Regier, Carpenter, Shedd, Bowers, Anderson and Parrett as directed by Shaw. All costs of service shall be advanced by the United States.

9. Defendants will serve and file an answer or responsive pleading to the remaining claims in the second amended complaint on or before 21 days following the date of service.

10. Shaw will serve upon defendants, or, if appearance has been entered by counsel, upon their counsel, a copy of every further pleading or other document submitted for consideration by the court. He will include with the original paper to be filed with the clerk of court a certificate stating the date and that a true and correct copy of any document was mailed to defendants or their counsel.

11. Shaw will keep the court informed of his current address at all times. All parties are bound by the Federal Rules of Civil Procedure and by the court's Local Rules while this case is pending.

Dated April 20, 2016.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE