UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JAMES ELMER SHAW, | 4:15-CV-04121-KES |
| Plaintiff, | |
| vs. | REPORT AND RECOMMENDATION |
| **TROY PONTO**, ASSOCIATE WARDEN, INDIVIDUAL AND OFFICIAL CAPACITY; **AL MADSON**, UNIT MANAGER, INDIVIDUAL AND OFFICIAL CAPACITY; **SAM BADURE**, UNIT MANAGER, INDIVIDUAL AND OFFICIAL CAPACITY; **DERICK BIEBER**, UNIT MANAGER, INDIVIDUAL AND OFFICIAL CAPACITY; **JACOB GLASIER**, UNIT COORDINATOR, INDIVIDUAL AND OFFICIAL CAPACITY; **DR. MARY CARPENTER**, M.D. (HEALTH SERVICES), INDIVIDUAL AND OFFICIAL CAPACITY; **DR. EUGENE REGIER**, MD, INDIVIDUAL AND OFFICIAL CAPACITY; **HEATHER BOWERS, RN** (HEATH SERVICES), INDIVIDUAL AND OFFICIAL CAPACITY; **AUDREY SHEDD**, HEAD REGISTERED NURSE, INDIVIDUAL AND OFFICIAL CAPACITY; | MOTION FOR SUMMARY JUDGMENT [DOCKET 50] |
| Defendants. | |

**INTRODUCTION**

This matter is before the court on plaintiff James Elmer Shaw's *pro se*

fourth amended complaint pursuant to 42 U.S.C. § 1983, filed September 12,

2016.  See Docket No. 41.  It was the third amended complaint, filed by

Mr. Shaw's then attorney, which was distributed with the summonses for

service upon the named defendants.  Though Mr. Shaw filed this action in

July, 2015, it was not served upon the defendants until much later. This is because Mr. Shaw amended his complaint twice and his later-appointed attorney amended it a third time, and because Mr. Shaw's complaint was screened twice—once by this court and the second time by the district court. Service upon the defendants who remained after the final screening was ordered on April 20, 2016. Docket 24. The docket indicates the defendants were served in July and August, 2016. Docket 30 and 37.

Mr. Shaw requested and was appointed counsel. Counsel filed the third amended complaint, which was the version of the complaint that was ordered to be served upon the defendants in April, 2016. Mr. Shaw, however, was dissatisfied with his then attorney and with the third amended complaint. Before the defendants' answer was due, Mr. Shaw filed the fourth amended complaint *pro se.* Mr. Shaw's attorney withdrew from her representation of Mr. Shaw. Docket 39 & 40. The defendants did not object to Mr. Shaw's *pro se* fourth amended complaint and when they filed their answer, indicated it was in response to the *pro se* fourth amended complaint. See Docket 42.

Defendants have now filed their summary judgment motion and in it, as well as their response to this pending motion, along with accompanying documents, they refer to the *pro se* fourth amended complaint. "It is well established that an amended complaint supercedes an original complaint and renders the original complaint without legal effect." In Re: Atlas Van Lines, 209 F.3d 1064, 1067 (8th Cir. 2000) (citation omitted). Mr. Shaw's *pro se* fourth amended complaint is twenty-seven (27) pages long and he made no indication

that he intended it to supplement rather than supplant his third amended complaint. For all purposes, therefore, only the fourth amended complaint is considered by this court. Mr. Shaw has been granted *in forma pauperis* status and has been allowed to proceed without payment of the partial filing fee. Docket 13.

The pending matter was referred to this magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and the March 31, 2017, order of the Honorable Karen E. Schreier, United States District Judge. The following is this court's recommended disposition.

## BACKGROUND

**A.  Mr. Shaw's Claims.**

As explained above, Mr. Shaw has filed a fourth amended complaint. This is the result of his previous complaints being screened twice; once by this court and once by the district court. See Docket Nos. 14 and 24. As a result, several parties Mr. Shaw originally named and several of the claims he originally articulated are no longer a part of this lawsuit. The court explains his remaining claims here in a greatly abbreviated form. Mr. Shaw was, at the start of this lawsuit, incarcerated at the South Dakota State Penitentiary. Docket 41 at ¶ 3. In Count One, Mr. Shaw alleges deliberate indifference to his serious medical needs. Beginning in 2004, he complained of knee pain, first in the right knee and eventually in the left knee. Id., ¶¶ 18, 60. He had surgery on his right knee in 2013, but was told that by then the damage was too great and beyond repair. Id. at ¶¶ 52-53. Mr. Shaw had surgery on his left knee on March 9, 2015, but reconstruction of the anterior cruciate ligament was impossible due to the delay.

Dr. Kalo told Mr. Shaw he would "have to live with the pain." Id. at ¶ 65.
Mr. Shaw believes the medical care he has received for his knee problems has been
untimely and inadequate, and that the delay and inadequacy has caused
unnecessary pain and suffering, amounting to deliberate indifference to his
serious medical needs. Id. at ¶¶ 191-199.

Mr. Shaw also alleges that as a result of untimely and inadequate medical
care for his knees, he now suffers from back problems, which he alleges the
defendants also treat with deliberate indifference. Id. at ¶ 193. He asks the court
to enter an order commanding the defendants to provide him with a CAT scan of
his lower back, a neurological consultation, high quality prosthetics and shoes as
deemed necessary by outside providers, in addition to compensatory damages for a
refund of all co-pays he has paid to prison health services since 2004, his pain
and suffering in the amount of at least $350.00 per day from May, 2008, to the
present, plus punitive damages in the amount of $250,000 against each named
defendant. Id. at pp. 25-26. Mr. Shaw requests a jury trial.

In Count Two, Mr. Shaw alleges the defendants interfered with his
constitutional right to receive mail. Docket 41, ¶¶ 161-175, 200-206. Specifically,
Mr. Shaw alleges the medical records clerk told him he could review his medical
records but that some records (utilization management, mental health, and
outside provider records) would be withheld. Id., ¶ 162. Mr. Shaw alleges his
inability to review these records prevents him from being able to determine why he
has not received treatment recommended by his outside medical providers. Id. at
¶ 163. He also alleges he has not been allowed to review his records because he
does not have enough money to do so. Id. at ¶ 165. He alleges he received some

but not all outside medical records he requested from CORE Orthopedics.  Id. at

¶ 171.  Mr. Shaw alleges that because he has not been allowed access to records

from outside medical providers, he believes mail from outside consultants is being

confiscated.  Id. at ¶¶ 174-175.

In Count Three, Mr. Shaw alleges a claim for retaliation.  Docket 41,

¶¶ 176-190; 207-214.  Mr. Shaw alleges after he initiated this lawsuit, the

defendants took adverse action against him that would chill a person of ordinary

firmness from continuing their protected activity.  Id. at ¶ 210.  Namely, he alleges

the defendants searched Mr. Shaw's cell and placed him in the special housing

unit (the "SHU") without cause.  Mr. Shaw alleges the defendants seized and failed

to return his property, including his legal materials.  Id. at ¶ 212.

**B.     The Defendants Named in Mr. Shaw's Fourth Amended Complaint**

In his fourth amended complaint, Mr. Shaw named nine defendants, falling

into two basic categories:  Mr. Shaw's institutional medical providers and persons

within the SDSP who hold supervisory positions.  They are as follows:

| Supervisory defendants: | Medical defendants: |
|---|---|
| Troy Ponto—Associate Warden | Heather Bowers, PAC—Dept. of Health Svcs. |
| Al Madsen—Unit Manager | Mary Carpenter, MD—Medical Director |
| Sam Badure--Unit Manager | E.R. Regier, M.D.—Dept. of Health Svcs. |
| Derrick Bieber—Unit Manager | Audrey Shedd, R.N.—Dept. of Health Svcs. |
| Jacob Glaser—Unit Coordinator | |

**C.     Facts.**

Defendants filed a statement of material facts which they allege are

undisputed.  See Docket No. 61.  Mr. Shaw has responded to that statement

item by item.  See Docket No. 109.  The following facts, then, are taken from

Mr. Shaw's complaint, the defendants' statements of material facts, and

Mr. Shaw's response to the same. Legitimate disputes over factual issues have been taken into consideration in the court's recitation of the facts.

The court notes, however, that many of Mr. Shaw's "disputes" with the defendants' statements of facts are not properly supported, as required by FED. R. CIV. P. 56(c) & (e), by citations to the record in order to disprove the accuracy of the defendants' statements. Instead, in many instances Mr. Shaw's "dispute" consists solely of his disagreement with the phraseology or chronological order in which the defendants have presented the facts. In other instances, to rebut the defendants' statement of an undisputed fact, Mr. Shaw refers the court back to the allegations made in his complaint.[1] This, standing alone, is insufficient. While the allegations in a complaint, standing alone, are sufficient to survive screening pursuant to 28 U.S.C. § 1915, the same cannot be said when the defendants move for summary judgment pursuant to FED. R. CIV. P. 56.

The United States Supreme Court has explained that when a summary judgment motion is made, the non-moving party cannot simply rely upon the allegations in the complaint or conclusory statements in an affidavit to dispute the moving party's properly supported statement of undisputed facts. "Rule 56(e) provides that judgment shall be entered against the nonmoving party unless affidavits or other evidence set forth specific facts showing that there is a genuine issue for trial. The object of this provision is not to replace

---

[1] Mr. Shaw alleges his complaint to be "verified" but there is no attestation and seal from a notary public establishing that Mr. Shaw swore under oath to the allegations in the complaint. See Docket 41, p. 27. The complaint is therefore not verified.

conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990). It is with this background in mind that the court has melded the defendants' statement of undisputed facts with Mr. Shaw's response to the same to form the fact section of this opinion.

**1.  Mr. Shaw's medical care.**

Both the defendants and Mr. Shaw have submitted copies of Mr. Shaw's medical records to the court. Mr. Shaw has had ongoing problems with his knees during his incarceration in the South Dakota prison system. Mr. Shaw was originally incarcerated in the South Dakota State Penitentiary (SDSP) in Sioux Falls, but has recently been moved to the Mike Durfee State Prison (MDSP) in Springfield.

A large part of Mr. Shaw's deliberate indifference claim is his frustration with the frequency with which his prison medical providers (sometimes Dr. Regier, but sometimes a physician's assistant or a nurse practitioner) requested a consult or certain treatment from an outside medical provider, but the request (referred to as "utilization management, or "UM") was denied by the Medical Director for Correctional Health for the State of South Dakota Department of Health (the "Medical Director"). Mr. Shaw theorizes that because these consults with outside providers or the treatments the outside providers would have provided had the UMs been approved were denied by the Medical Director, the condition of his knees deteriorated to a point where they are now beyond repair.

As it pertains to this lawsuit, the Medical Director is Dr. Mary Carpenter. Dr. Mary Carpenter has provided an affidavit in this lawsuit (Docket 58) in which she avers that prior to 2012, she was a private practice physician in Winner, South Dakota. Id. at ¶ 2. She explains she became the Medical Director for Correctional Health in 2012. Id. at ¶ 3. She included a chart in her affidavit indicating she began considering UMs for Mr. Shaw's treatment in 2012. Id. at ¶ 9. She submitted a supplemental affidavit (Docket 112) explaining that for a brief period of time in 2011 she did contract work for the South Dakota Department of Health, which included performing UM reviews. Id. at ¶ 8.

The defendants have submitted evidence which indicates Dr. Carpenter first considered UMs regarding Mr. Shaw in December, 2011. See Docket No. 51-3. pp. 9-10. Specifically, Dr. Carpenter denied a UM submitted by a prison health care provider on December 14, 2011, for an MRI of the right knee, but included in that denial was Dr. Carpenter's suggestion for conservative treatment such as a brace or physical therapy. See Docket 51-3, p. 9. A week later on December 22, 2011, Dr. Carpenter approved a UM for physical therapy on the right knee. See Docket 51-3, p. 10.

Prior to December, 2011, it does appear that someone other than Mary Carpenter was the Medical Director and/or was making determinations about Mr. Shaw's UMs. See Docket 51-3, p. 8. Dr. Mary Carpenter's affidavit chart indicates that after she became the Medical Director she reviewed twenty-two UMs regarding Mr. Shaw, and that she approved twenty-one of them. See

chart contained within Docket 58.  The two UMs from December, 2011, considered by Dr. Carpenter however, are not included in the chart.  Id.  So to be accurate, Dr. Carpenter considered twenty-four UMs regarding Mr. Shaw and approved twenty-two of them.  Docket 58 chart, Docket 51-3, pp. 9-10.

The earliest medical record in evidence for Mr. Shaw is dated April 3, 2002.  Docket 51-2, pp. 1-2.  Mr. Shaw saw Dr. Kolodychuk (an orthopedist from the Orthopedic Institute—"OI") at Dr. Regier's request.  Id.  The purpose of the visit was to discuss the "growth" on Mr. Shaw's fibula.  Dr. Kolodychuck believed it was a large osteochondroma[2] or bone cyst.  Id.  He suspected it was benign but recommended an MRI.  Id.  There is no evidence the MRI was performed until 2008.  Id. at p. 3.

Mr. Shaw was seen for treatment of his right knee, however, in other ways between 2002 and 2008.  In June, 2004, Mr. Shaw visited prison health services after twisting his right knee playing basketball.  Docket 51-1, p. 1.  X-rays were ordered and were compared to previous X-rays of December, 2001.  Id.  They showed no significant change from the 2001 X-ray.  Id.

---

[2] An osteochondroma is an overgrowth of cartilage and bone that happens at the end of the bone near the growth plate. Most often, it affects the long bones in the leg, the pelvis, or the shoulder blade.

Osteochondroma is the most common non-cancerous bone growth. It most often occurs between ages 10 and 30. It affects males and females equally. The most common symptoms of osteochondroma are a hard mass that is painless and does not move, lower than normal height for one's age, one leg or arm that is shorter than the other, pressure or irritation with exercise, and soreness of nearby muscles.
http://www.hopkinsmedicine.org/healthlibrary/conditions/bone_disorders/osteochondroma_85,p00125/  (last checked August 23, 2017).

In July, 2004, Mr. Shaw visited prison health services regarding his "recent strain of the right knee." Id. at p. 2. During the July, 2004, visit Mr. Shaw indicated he was "getting along reasonably well," and that "pain does not appear to be a big factor." Id. Mr. Shaw told the provider he was not playing sports. Id.

In July, 2005, Mr. Shaw visited prison health services again complaining of right knee pain. Id. at p. 3. The physician's assistant noted the presence of the lesion on Mr. Shaw's tibia/fibula, which was not yet encroaching on the joint space. Id. The PA noted Mr. Shaw had been instructed not to participate in athletics but chose to do so anyway and subsequently injured his knee over the Fourth of July weekend playing basketball. Id. The PA again reminded Mr. Shaw to refrain from athletics. The PA prescribed "med ice" for six months. Id. It appears the restriction from athletics was lifted as of April, 2006. Docket 51-1, p. 4.

In July, 2006, one of the physician's assistants from prison health services saw Mr. Shaw for right knee pain. Docket 51-1, p. 5. The PA referred again to the growth on Mr. Shaw's right knee. Id. The PA had submitted a UM in June, 2006, for Mr. Shaw to return to the orthopedist for a consult regarding the growth and a possible surgical excision, but the UM was denied. Id. When Dr. Regier saw Mr. Shaw in November, 2006, Dr. Regier again ordered X-rays of the right knee. Docket 51-1 at p. 6. Dr. Regier noted X-rays had been performed in June, 2006, but the request for an ortho consult had been denied. Id. The June, 2006, X-ray regarding the "prominent" osteochondroma

growth on Mr. Shaw's right tibia (note this is incorrect, the lesion was at the fibula) at the knee remained unchanged from previous films. Id. Dr. Regier ordered repeat X-rays and recommended Mr. Shaw to return to prison health in 3 or 4 weeks. Id. at p. 7.

When Mr. Shaw returned to prison health services in January, 2007, the new X-rays showed "no change since the prior examination." Docket 51-1 at p. 8. Mr. Shaw reported no persisting pain, and that he was ambulating without difficulty. Id. He also reported to Dr. Regier that he had a knee "sleeve" or "band" that he wore for support. Id. He did not complain of swelling, tingling or numbness. Id.

Mr. Shaw did not return to prison health services for over a year. When he appeared he underwent another X-ray of his right knee on April 8, 2008. Docket 51-1, p. 17. The X-ray showed no significant change of the osteochondroma of the proximal fibula compared to the prior exam. When Mr. Shaw saw Dr. Regier a week later, Dr. Regier decided to submit a UM for an orthopedic consult because it appeared the osteochondroma was becoming more symptomatic. Id. at p. 10-11. Dr. Regier made the UM request for an orthopedic consult on April 18, 2008, and it was approved on April 21, 2008. Docket 51-3, p. 1.

Mr. Shaw saw Dr. Evan Hermanson on May 5, 2008. Docket 51-2, pp. 7-8. In advance of his appointment with Dr. Hermanson, Mr. Shaw underwent an MRI of his right knee on April 28, 2008. Docket 51-2, pp. 3-4. The MRI of the right knee revealed a complex tear of the lateral meniscus in addition to the

osteochondroma, which extended over the tibia and fibula, or possibly two osteochondromas which had grown together. Id. Dr. Hermanson's impression was that Mr. Shaw's knee pain "seems to be associated with the osteochondroma and overlying bursa." Docket 51-2 at p. 7. Dr. Hermanson's note says:

> **I discussed this with him**. Although he has a meniscal tear **I do not think taking out the meniscus is going to improve his knee pain at all,** since his pain is further distal than the actual joint. **If he wanted to pursue having an osteochondroma excised in hopes that this would improve his pain than he would need to be referred to an orthopedic tumor surgeon. I discussed trying to coordinate that, but he does not to (sic) proceed** with what would likely be a large undertaking to remove that osteochondroma.

Id. (emphasis added). Dr. Hermanson recommended Ibuprofen 60 milligrams, three times a day for pain. Id. at p. 8. Although Mr. Shaw now claims that (1) Dr. Hermanson orally told him better shoes would alleviate his pain; and (2) after he [Shaw] returned to the prison he changed his mind and decided he did want to proceed with the surgical removal of the osteochondroma,[3] there is no evidence in the record to substantiate either of these claims. Mr. Shaw submitted two "medical correspondence" documents dated in May and July,

---

[3] In his complaint, Mr. Shaw alleges he never knew Dr. Hermanson recommended surgery because Dr. Regier hid this recommendation from him. Docket 41, ¶ 38. But in his response to the defendants' statement of undisputed facts, Mr. Shaw claims that after his consult with Dr. Hermanson, he "returned to the prison . . . considered his options and decided he wanted the surgery on the osteochondroma due to the fact he could no longer bare (sic) the pain." Mr. Shaw cannot now simultaneously assert he knew nothing of Dr. Hermanson's recommendation for surgical removal of the osteochondroma until three years later because of Dr. Regier's alleged deception while at the same time assert that after returning to prison from Dr. Hermanson's appointment he "considered his options and decided he wanted surgery on the osteochondroma."

2008.  One requests "better fitting shoes" and the other denies "New Balance" shoes.  Docket Nos. 109-7 and 109-8.  It is unclear, however, who made and who denied the shoe requests.  <u>Id.</u>

On August 5, 2008, one of the prison health physician's assistants submitted a UM for Mr. Shaw to consult with an orthopedic physician's assistant.  It was approved the same day.  Docket 51-3, p. 2.  In July, 2009, however, Mr. Shaw saw Jess Oakley, the physician's assistant at prison health services.  Docket 51-1 at p. 16.  PA Oakley noted that he saw Mr. Shaw in August, 2008, and requested a UM for an orthopedic consultation, not a consultation with an orthopedic PA.  <u>Id.</u>  PA Oakley indicated that "apparently there was a breakdown in communication."  <u>Id.</u>  PA Oakley requested a UM for a consultation with Dr. Zoellner, an orthopedic surgeon.  <u>Id.</u>  That UM was approved on July 13, 2009, (Docket 51-3, p. 3) and Mr. Shaw had an appointment with Dr. Zoellner on August 11, 2009.  Docket 51-2, p. 50.

Dr. Zoellner recommended a cortisone shot.  A UM for this procedure was submitted and approved.  Docket 51-3, p. 5.  If Mr. Shaw's symptoms improved with the cortisone shot, Dr. Zoellner indicated Mr. Shaw "may benefit from a scope and partial meniscectomy."  Docket 51-2, p. 50.  **On October 9, 2009, Mr. Shaw returned to Dr. Zoellner and reported that the cortisone shot provided relief.  <u>Id.</u>  Therefore, Dr. Zoellner recommended a scope, partial meniscectomy, and chondroplasty.  Mr. Shaw indicated he understood and consented to the surgery.  <u>Id.</u>** (emphasis added).

In February, 2010, PA Oakley submitted a UM for the surgery recommended by Dr. Zoellner. Docket 51-3, p. 6. That UM was denied in March, 2010. Id. The comment on the UM denial states, "recommend 6 months of conservative measures. Resubmit in 6 months if no improvement." Id. In April, 2010, an "Inmate Activity and Health Classification" form was completed by an unknown prison official. Docket 51-1, p. 21. It notes "no restrictions" for Mr. Shaw for lifting, standing, bending or stooping. Id. It does not restrict him in any way for work or housing purposes. Id.

Something occurred to change this restriction on or about July 19 or 20, 2010. The defendants assert Mr. Shaw was playing basketball and re-injured his knee. Docket 51-1, ¶ 20. Mr. Shaw asserts he fell while working in the prison kitchen. Docket 31, ¶ 36. Whatever the cause, Mr. Shaw's physical restrictions were changed to "no sports, no running, no climbing x 3 months" and a new X-ray of his right knee was ordered. Docket 51-1, p. 21.

The July 20, 2010, X-ray of Mr. Shaw's right knee was compared to the previous X-ray taken in August, 2009. Docket 51-2, p. 9. It showed a stable osteochondroma but a new joint effusion without evidence of dislocation. Id. No large fracture was identified. Id. On August 16, 2010, Mr. Shaw received a medical order for "med ice" which expired 48 hours later, on August 18, 2010. Docket 51-1, p. 22. On August 26, 2010, Dr. James Schaeffer from prison health re-submitted a UM for the surgery Dr. Zoellner had recommended back in October, 2009. Docket 51-3, p. 7. Dr. Schaeffer noted on the UM that Mr. Shaw had been on Naproxen and had a knee sleeve for 6 months. Id.

Nevertheless, the UM for the surgical procedure on Mr. Shaw's right knee was once again denied. Id. [4]

X-rays were taken of both Mr. Shaw's knees in July, 2011. Docket 51-2, pp. 10-14. The diagnostic report generated by the radiologist showed, as to the right knee, the osteochondroma of the fibula, extending to the tibia. Id. p. 13. There were no acute injuries or fractures, but there were suspected slight degenerative changes of the lateral and patellofemoral greater than medial joint compartments. Id. As for the left knee, the X-ray showed suspected mild degenerative change of the patellofemoral joint, but was otherwise unremarkable. Docket 51-2, p. 10.

Dr. Regier saw Mr. Shaw at prison health services on August 24, 2011. Docket 51-1, p. 23. In this treatment note, Dr. Regier recounted Mr. Shaw's visit with Dr. Hermanson on May 5, 2008, in which Dr. Hermanson attributed Mr. Shaw's right knee pain to the osteochondroma rather than the meniscus tear. Id. Dr. Regier also recounted Mr. Shaw's decision not to proceed with surgical removal of the osteochondroma. Id. Dr. Regier also reiterated that later, in October, 2009, Dr. Zoellner had recommended surgery on Mr. Shaw's right knee after the MRI had shown a tear in the meniscus and Mr. Shaw had received relief from a cortisone shot. Id. Dr. Regier acknowledged that the UM for the surgery recommended in October, 2009, had been denied. Id. Dr. Regier noted Mr. Shaw was now complaining of worsening pain in the right knee to the point of keeping him awake at night, and that his left knee was also

_____

[4] It is unknown who the Medical Director was at this time, the initials on the UM are not those of Mary Carpenter. Docket 51-3, p. 7.

beginning to hurt.  Id.  Dr. Regier renewed Mr. Shaw's order for a knee sleeve,

and placed a UM for an orthopedic consult.  Id.  This UM was approved on

August 27, 2011.  Docket 51-3, p. 8.

On September 14, 2011, Mr. Shaw saw Dr. Jonathan Blake from CORE

Orthopedics.  Docket 51-2, p. 15.  Mr. Shaw complained of ongoing and

worsening right knee pain, and mild left knee pain.  Id.  Dr. Blake's

recommendation was

> As it has been a while, I would like to obtain a repeat MRI of his
> right knee and possibly proceed with a knee arthroscopy.  We had
> an initial discussion about what this would entail, including the
> possible beneficial outcome versus the fact that he may proceed
> with no benefit or he could have actually worsening of
> symptomatology or some remote possibility of catastrophic
> outcomes.  All his questions are answered today.  We will get the
> MRI, see him back and go from there.

Id.  On December 14, 2011, Ryan Manson, a certified nurse practitioner from

prison health services, submitted the UM for the MRI requested by Dr. Blake.

Docket 51-3, p. 9.  Dr. Mary Carpenter denied it, stating she would

"recommend conservative treatment such as PT or a brace for support."  Id.

On December 22, 2011, Nurse Manson promptly placed a UM for physical

therapy.  Docket 51-3, p. 10.  Dr. Carpenter approved this UM on the same

day it was submitted.  Id.

On January 13, 2012, Mr. Shaw received a medical order for ice and

crutches.  Docket 51-1, p. 24.  The order for ice expired on January 15, 2012,

and the order for crutches expired on January 20, 2012.  Id.  During his initial

physical therapy session at Avera McKennan on January 25, 2012, the outside

physical therapist noted that Mr. Shaw indicated he "injured his knee last week

while playing basketball." Docket 51-2 at p. 16. This medical note from the outside physical therapist coincides with the orders for med ice and crutches dated the prior week from the prison medical providers. Mr. Shaw asserts in his complaint, however, that he re-injured his knee on November 1, 2011, while working in the kitchen at SDSP. Docket 41, ¶ 41. Whatever the source of the latest re-injury, the Avera McKennan physical therapist conducted an exam of Mr. Shaw's right knee. Docket 51-2, p. 17. He found that valgus and varus stress tests were negative for laxity though Mr. Shaw did report discomfort. Lachman's test was negative.[5] The physical therapist opined Mr. Shaw "should benefit from an exercise program to address the strength, range of motion and control . . ." Id.

On May 30, 2012, Mr. Shaw presented to the nursing staff complaining of right knee pain. Docket 51-1, p. 25. The nurses noted no swelling, and indicated ice could be given as a "comfort measure" but was not medically necessary. The nursing staff recommended ice to Mr. Shaw's unit manager and advised that Mr. Shaw also wanted his theraband renewed. Id. Mr. Shaw returned to the nursing staff on June 5, 2012, complaining of right knee pain for the last ten years. Docket 51-1, p. 26-27. He requested med ice, extra towels and an extra pillow. Id. The nurse recommended an extra pillow for 7

---

[5] The Lachman's test is a passive test to identify the integrity of the anterior cruciate ligament (ACL). https://www.physio-pedia.com/Lachman_Test (last checked August 24, 2017). A positive Lachman's test is strong evidence of an existing ACL tear, while a negative Lachman's test is strong evidence against the existence of such an injury.
http://www.aafp.org/afp/2005/0315/p1169.html (last checked August 24, 2017).

days and medical ice at health services for pain and swelling for 7 days.  Id.

On July 12, 2012, a medical order was entered indicating ice at health services

was a "comfort measure" and was not medically necessary.  Docket 51-1, p. 28.

In his complaint, Mr. Shaw alleges it was nurse Audrey Shedd who entered this

order.  Docket 41, ¶ 45.  Nurse Shedd, however, has explained that she was on

maternity leave at this time so she could not have entered this order.  Docket

53, ¶ 6.

On August 11, 2012, Mr. Shaw's unit staff called health services for an

explanation of the medical orders regarding his med ice and theraband.

Docket 51-1, p. 29.  The nurses explained the current status which was that

there was a recommendation for the use of ice and theraband but unit staff

had the "final say" about whether these items would be allowed.  Id.

On September 7, 2012, Dr. Regier and/or PA Manson referred Mr. Shaw

for more X-rays of the right knee.  Docket 51-1, p. 30.  Compared to the prior

X-ray of July, 2011, it showed no significant change from that film as to the

osteochondroma.  The X-ray again showed mild degenerative changes of the

medial, lateral and patellofemoral compartments of the knee.  Id.  On October

2, 2012, Mr. Shaw received an order for daily med ice which expired on April 1,

2013.  Docket 51-1, p. 31.  On October 27, 2012, Mr. Shaw received a medical

order for the use of crutches for 7 days.  Docket 51-1, p. 32.  On October 29,

2012, another X-ray of the right knee was performed.  Docket 51-1, p. 33.  This

record indicates the X-ray was ordered after a "falling twisting injury."  Id.  The

X-ray again noted the large osteochondroma which had not changed from the

previous film.  Id.  There were degenerative changes of the medial, lateral and patellofemoral compartments of the knee.  No acute fractures were noted.  Id.

On November 8, 2012, Dr. Regier submitted a UM for Mr. Shaw to see an orthopedist at CORE Orthopedics regarding the large osteochondroma on his right knee.  Docket 51-3 at p. 11.  Dr. Mary Carpenter approved the UM on the same day.  Id.  Mr. Shaw saw Dr. Kalo on December 12, 2012.  Docket 51-2, p. 18.  Dr. Kalo recommended an MRI of the right knee to assess the osteochondroma and the meniscal tear, and Dr. Kalo indicated Mr. Shaw would need a knee scope after the MRI.  Id.

The next day (December 13, 2012)  Dr. Regier submitted a UM for the MRI suggested by Dr. Kalo.  Docket 51-3, p. 12.  Dr. Carpenter approved this UM on December 26, 2012.  Id.  The MRI was performed on January 2, 2013.  Docket 51-2, p. 19-20.  It revealed the following:  (1) a new anterior cruciate ligament  (ACL) tear; (2) a new tear of the medial meniscus posterior horn; (3) increased/new cartilage defects in the medial and lateral femorotibial compartments; (4) unchanged tear of the lateral meniscus body as well as partial extrusion; (5) unchanged osteochondroma; and (6) Baker's cyst with more intrabursal bodies.

On March 28, 2013, Dr. Regier submitted a UM for Mr. Shaw to again be seen by Dr. Kalo at CORE Orthopedics.  Docket 51-3 at p. 13.  Dr. Carpenter approved this UM the same day.  Id.  Mr. Shaw saw Dr. Kalo on April 10, 2013.  Docket 51-2, p. 21.  Dr. Kalo reviewed the most recent MRI and

assessed (1) medial meniscal tear of the right knee; (2) degenerative joint disease of the right knee; and (3) grade 3 ACL sprain.  Id.  He explained Mr. Shaw's options:

> Based on the degree of degenerative joint disease, especially the MRI scan and the loss of articular cartilage on the medial aspect of the right knee, all we really have to offer the patient today is a right knee arthroscopy for some debridement of the knee and ACL reconstruction would not benefit this knee based on the degree of degenerative joint disease that is already seen.  The chondroplasty as well as trimming of the medial meniscal tear may benefit the patient on a short-term basis with the hopes that we can polish off the remaining articular cartilage, sparing as much as possible as we can with the hopes of buying this knee more years.  We did discuss  the possible use of a brace with this patient today for some stability, although he reports that he is not having any instability type symptoms on this knee, just more the pain that he has with twisting and turning.  I believe that this could be helped with a right knee arthroscopy as he goes forward with the thoughts of knowing that as this knee goes forward this may need to see arthroplasty down the road, hopefully  in several years' time, but with this degree of degenerative joint disease in the medial aspect of the knee this is the knee's future.  We will see how we can get things arranged through our local penitentiary system to get him set up for this surgery as their schedule allows.

Id.  An order was placed for med ice for Mr. Shaw in April, 2013, to last for two months.  It was renewed in June, 2013.  The signature for the order is illegible.  Docket 51-1, p. 34.  On May 9, 2013, Dr. Regier submitted a UM for Mr. Shaw to obtain the surgery recommended by Dr. Kalo.  Docket 51-3, p. 14.  Dr. Carpenter approved this UM on May 16, 2013.  Dr. Kalo performed the surgery on June 14, 2013.  Docket 51-2, pp. 22-24.

Dr. Kalo's surgical report indicates he performed an arthroscopic partial medial and lateral menisoectomies, arthrocopic chondroplasty patella, trochlea, lateral femoral condyle, medial tibial plateau, microfracture medial femoral

condyle.  Id. p. 22.  Dr. Kalo noted that Mr. Shaw's knee was "severely arthritic" and that his ACL was "obviously deficient."  Id.  Based on the degree of arthrosis, however, Dr. Kalo did not believe reconstructing the ACL would be beneficial to Mr. Shaw.  Id.  Dr. Kalo's  post-surgery plan was to use "brace management" strategies on Mr. Shaw's right knee, along with anti-inflammatories and injections, with arthroplasty as a long-term option.  Id. at p. 24.  On June 17, 2013, a medical order was entered for Mr. Shaw to have med ice and crutches for seven days, expiring on June 23, 2013.  Docket 51-1, p. 35.

On June 18, 2013, PA Ryan Manson submitted a UM for Mr. Shaw to have a follow-up appointment with Dr. Kalo.  Docket 51-3 at p. 15. Dr. Carpenter approved this UM the same day.  Id.  Mr. Shaw saw Dr. Kalo for the follow-up on June 20, 2013.  Docket 51-2 at p. 25.  He reported his post-op recovery had been "doing well."  Id.  The sutures were removed and Dr. Kalo observed the expected amount of swelling and bruising.  Id.  Dr. Kalo reiterated the long-term plan for use of anti-inflammatories and injections, and recommended a return visit in 4-6 weeks for fitting of a brace.  Id.

On June 21, 2013, Dr. Regier submitted a UM for the follow-up appointment with Dr. Kalo.  Docket 51-3, p. 16.  Dr. Carpenter approved this UM on the same day.  Id.  Mr. Shaw saw Dr. Kalo on July 25, 2013.  Docket 51-2, p. 26 & 49.  Dr. Kalo wrote a letter indicating Mr. Shaw had an unstable knee and should refrain from doing sports.  Id.  at p. 26.  Dr. Kalo also indicated Mr. Shaw needed a knee brace (not a sports brace) to protect the

knee while Mr. Shaw performed activities of daily living, such as walking.  Id.
Dr. Kalo asked the penitentiary personnel to contact him to coordinate the
provision of the brace for Mr. Shaw.  Id.  Dr. Kalo reiterated that Mr. Shaw did
not need and was not interested in ACL reconstruction given his other
problems, but that he should proceed with obtaining the knee brace.  Id. at p.
49.

On August 2, 2013, PA Ryan Manson submitted a UM for a functional
knee brace from CORE Orthopedics.  Docket 51-3, p. 17.  This UM was
approved by Dr. Carpenter on August 5, 2013.  Id.  The appointment was
scheduled for August 5, 2013.  Id.  On August 23, 2013, Mr. Shaw was notified
of the following medical orders that had been entered for him:  exercise bike,
med ice and an extra pillow for six months.  Docket 51-1, p. 39.  These orders
were renewed in February, 2014.[6]

On September 5, 2013, Mr. Shaw visited health services.  Docket 51-1, p.
41.  The nursing note indicates there was a small gap on the inner aspect of
Mr. Shaw's knee brace, so health services intended to request a neoprene
sleeve to fit underneath the brace.  Id.

In February, 2014, Dr. Carpenter issued a memo to "all offenders" which
was intended to clarify the responsibility of the South Dakota Department of
Health regarding requests by inmates for items such as special shoes, long
underwear, fans, single cells, medical showers, extra mattresses, pillows,
blankets, etc.  See Docket 51-1, p. 86.  These items were deemed "comfort

---

[6] The court notes there is no reference to the record for the renewal.  However,
Mr. Shaw does not dispute this fact.

items" which were not necessary for good medical care.  Id.  The only possible

exception was a lower or middle bunk, stair restrictions, and legitimate work

restrictions due to a medical diagnosis.  Id.  Dr. Carpenter reiterated that

health services would not address requests for comfort items or custodial

issues.  Id.  See also, Heather Bowers Affidavit, Docket  66, ¶ 15; Audrey Shedd

Affidavit, Docket 53, ¶ 8.

Mr. Shaw visited health services on March 13, 2014, complaining of pain

in his left knee, worsening in the last few days.  Docket 51-1, p. 42.  He

requested an extension of pain meds.  Id.  Mr. Shaw objects to the reference to

this medical record, because it appears to refer to the surgery on his left knee,

which occurred in March of 2015, not March of 2014.  See Docket 51-2, p. 27.

On March 28, 2014, PA Ryan Manson submitted a UM for Mr. Shaw to

have his right knee brace adjusted at CORE Orthopedics.  Docket 51-3, p. 18.

Dr. Carpenter approved the UM two days later.  Id.  Mr. Shaw asserts this knee

brace adjustment never occurred.[7]

On July 17, 2014, PA Ryan Manson submitted a UM for an MRI of

Mr. Shaw's left knee.  Docket 51-3, p. 19.  Dr. Carpenter approved this UM on

July 19, 2014.  Id.  The MRI of Mr. Shaw's left knee was performed on

August 6, 2014.  Docket 51-1, p. 45-46.  It showed (1) trace joint effusion and

moderate sized Baker's cyst; (2) complex macerated tearing of most of the

lateral meniscus with little intact meniscus remaining; (3) chronic tear of the

---

[7] The nursing notes and physicians orders do show repeated attempts to obtain
and find a properly fitting knee brace for Mr. Shaw's right knee.  Docket 51-1,
pp. 41 and 47.

ACL; (4) question horizontal tear of the posterior horn of the medial meniscus; and (5) cartilage defects, fairly significant of the lateral femoral tibial compartment and mild degenerative changes of the patellofemoral compartment.  Id. at p. 46.

As a result of these MRI results, on August 12, 2014, PA Ryan Manson submitted a UM for a left knee consult with CORE Orthopedics. Docket 51-3, p. 21.  Dr. Carpenter denied this UM on August 29, 2014, with the explanation "chronic degenerative condition." Id.  On October 24, 2014, orders for Mr. Shaw's right knee brace and a "sleeve" for his left knee were renewed for one year.  Docket 51-1, p. 47.

On December 15, 2014, PA Ryan Manson again submitted a UM for Mr. Shaw to see Dr. Kalo at CORE Orthopedics.  Docket 51-3, p. 20.  This time, Dr. Carpenter approved the UM on the same day it was submitted.  Id. Mr. Shaw saw Dr. Kalo on January 15, 2015.  Docket 51-2, p. 31.  Dr. Kalo ordered X-rays and reviewed the MRI of the left knee.  Id.  He assessed a grade 3 ACL sprain of the left knee, a lateral tear of the meniscus, and patellofemoral arthrosis.  Id.  Dr. Kalo discussed with Mr. Shaw the importance of evaluating the knee arthroscopically to determine (as with the right knee previously) whether the damage to the ACL would prohibit reconstruction of that ligament or whether brace management would be optimal.  Dr. Kalo stressed that taking care of the meniscus was "vitally important" to the overall longevity of Mr. Shaw's left knee.  Id.

On January 15, 2015, PA Ryan Manson submitted a UM for the surgery proposed by Dr. Kalo. Docket 51-3, p. 22. Dr. Carpenter approved this UM on February 2, 2015. Id. Dr. Kalo performed the surgery on March 9, 2015. Docket 51-2, pp. 27-30. As with his right knee, Dr. Kalo indicated that "in no way any sort of reconstruction would help this gentleman given the severity if his knee, the only thing that will help him long term will be injections, anti-inflammatory use rigorously and/or knee arthroplasty." Id. at pp. 28-29. And again as with the right knee, Dr. Kalo indicated that a knee arthroplasty would be in the distant future, given Mr. Shaw's young age. Id. at p. 29.

On March 9, 2015, a medical order was entered instructing that upon his return from surgery, Mr. Shaw was to have ice to this left knee as tolerated, that he was to keep his left knee elevated above his heart, and that he was to begin knee exercises 48 hours post-surgery. Docket 51-1, p. 50. On March 18 and 19, these orders were renewed. Id. at pp. 50-51. The March 19 order indicates the ice order was for an additional six weeks, and the elevation order was for an additional month. Id. at p. 51.

Mr. Shaw does not dispute that these medical orders were entered, but he asserts they were not followed by unit staff (specifically defendants Madsen) and Ponto and Mr. Shaw asserts that he (Shaw) did not receive any med ice until three days after his surgery, on March 12. See Docket 41, ¶¶ 85-101. Instead, Mr. Shaw asserts that upon his return from surgery, he was forced to return first to the SHU and then to his old cell with no accommodation for medical ice or elevation of his knee. Id. at ¶ 68. Upon return from surgery on

the left knee, Mr. Shaw requested a two-man or handicap cell to facilitate easier access in and out of his bunk.  Id.  Mr. Shaw has produced no evidence he had a medical order for a handicap cell upon his return from surgery.

The defendants assert Mr. Shaw was sent to the SHU upon his return from surgery because he refused his housing assignment when he was not given a handicap cell but was told he would be returned to his old cell.  Glaser Affidavit, Docket 56, ¶ 12; Badure Affidavit, Docket 59, ¶ 7; Madsen Affidavit, Docket 52, ¶ 9.  During his time in disciplinary segregation (in the days immediately following his left knee surgery) defendant Madsen refused to provide the ice that was medically ordered for Mr. Shaw's knee because he relies on medical personnel to alert him of medical orders, and he was not aware of Mr. Shaw's medical orders.  Madsen Affidavit, Docket 52 at ¶ 13.  Mr. Shaw alleges that during this time, he was in intense pain as a result of having just undergone surgery, and that he requested the ice, pain medication and ability to elevate his knee that had been ordered by his physician.  Docket 41, ¶¶ 67, 82.  Mr. Shaw asked Unit Manager Madsen for medical treatment, but Mr. Madsen refused.  Id. at ¶ 85.  Mr. Madsen does not deny he refused these items, but asserts he was unaware of the medical orders.  Madsen Affidavit, Docket 52, ¶ 13.  The Affidavit of Heather Bowers makes clear that medical orders follow an inmate, even to the SHU.  Bowers Affidavit, Docket 66, ¶ 15.  Mr. Shaw asserts that upon his release from the SHU, he begged Associate Warden Ponto for help, but Associate Warden Ponto did nothing.  Docket 41, ¶¶ 93-109.

26

On March 18, 2015, Dr. James Schaeffer from prison health submitted a UM for an urgent follow up for Mr. Shaw with Dr. Kalo from CORE Orthopedics due to a possible infection at the surgical site on Mr. Shaw's left knee. Docket 51-3, p. 23. This UM was approved by Dr. Carpenter on March 23, 2015. Id.[8]

Though the UM was not approved by Dr. Carpenter until March 23, Mr. Shaw saw Dr. Kalo on March 19. Docket 51-2, p. 32. Dr. Kalo noted that Mr. Shaw suspected his knee might be infected because it was swollen, red and felt warm. Id. Dr. Kalo's examination, however, revealed no infection but instead an expected amount of swelling and warmth following surgery. Id. Dr. Kalo observed a "very normal knee finding." Id. Dr. Kalo encouraged Mr. Shaw to continue icing his knee and to continue anti-inflammatory use, and eventually the use of an "off-the-shelf" ACL knee brace. Id. Dr. Kalo also reiterated that Mr. Shaw would no longer be able to participate in "cutting and pivoting" type sports. Id.

On April 21, 2015, PA Brad Adams submitted a UM for an ACL brace for Mr. Shaw's left knee. Dr. Carpenter approved this UM the same day. Docket 51-3, pp. 24-25. On May 1, 2015, Mr. Shaw visited Orthotic and Prosthetic Specialties (O & P) regarding his left knee brace. Docket 51-2, p. 33. Mr. Shaw denies he was specially fit with a brace but the note from O & P states in part, "I have measured and fit with an Ossur MVP contour size lg knee brace. Using bending irons, I contoured the brace to fit the patient's anatomy . . ." During

---

[8] Dr. Carpenter's affidavit indicates the UM was approved verbally on the date it was submitted (March 18) and in writing on March 23. Whichever date the UM was approved, Mr. Shaw saw Dr. Kalo on March 19.

this same visit, the orthotist discussed coordinating the ordering of another

under sleeve for Mr. Shaw's right knee brace through prison health services.

Id.

In response to an inquiry from Mr. Shaw, Dr. Kalo wrote a letter to

Mr. Shaw dated May 6, 2015. Docket 51-2, p. 34. Dr. Kalo's letter stated in

part:

> I'm not sure any brace will solve this issue . . . Your question here
> about them making you walk up and down stairs is probably
> something you need to avoid . . . There is an appropriate time to
> use ice and elevation, particularly after harder activities or more
> walking. Icing isn't always beneficial for arthritic knees and
> elevation from time to time, but certainly some exercise of a non-
> pounding fashion is also appropriate . . .Your knee is arthritic.
> Unfortunately, it is a knee that is going to need some long-term
> treatment with anti-inflammatories, brace management, and even
> potentially injections that may be a part of your future options that
> may include hyaluronic acid or corticosteroids or platelets may be
> an appropriate option in the future. You are not unlike other
> patients I have that are fighting the same arthritic battle at a
> younger age but at this point will have to continue to monitor
> those and take the least aggressive management for these things
> as to not cause damage to the knee, particularly with early
> injections that is a concern always.

Id. Mr. Shaw does not dispute this letter was written by Dr. Kalo or the

content of the letter but he asserts it was intercepted by the defendants and

that he (Mr. Shaw) did not see it until this lawsuit started.

On May 21, 2015, Mr. Shaw told the prison health nursing staff that

recovery for his left knee had "gone okay for the most part however pain in the

left knee continues." Docket 51-1, pp. 56-58.

On June 16, 2015, PA Brad Adams again submitted a UM for Mr. Shaw

to visit O & P for evaluation and adjustment of Mr. Shaw's left knee brace.

Docket 51-3, p. 26, Docket 51-1, p. 60. Dr. Carpenter approved this UM on June 17, 2015. Id. Mr. Shaw had an appointment on June 26, 2015 at O & P for the left knee brace adjustment. Docket 51-2, p. 35.

On June 23, 2015, Mr. Shaw received an injection for his right knee at health services. Docket 51-1, pp. 62-64. A health services note dated July 1, 2015, indicates Mr. Shaw visited and believed his left knee pain worsened after the brace was adjusted on June 26. He also inquired about a previously mentioned MRI of the low back and left elbow. Docket 51-1, p. 65. Mr. Shaw's med ice and medical shower order had expired on June 30. Id. Dr. Regier entered a "no stair" order for Mr. Shaw on July 29, 2015, with a one-year duration. Docket 51-1, p. 68.

On July 9, 2015, Dr. Kalo again wrote to Mr. Shaw, again apparently in response to an inquiry from Mr. Shaw. Docket 51-2, p. 36. This letter addressed knee pain, but declined to address the cause of Mr. Shaw's back pain. Id. Specifically, Dr. Kalo indicated diminished stair climbing would be "appropriate." Id. Dr. Kalo declined to attribute the cause of Mr. Shaw's low back pain to his knee conditions. Id. Dr. Kalo also indicated the pain Mr. Shaw was describing was atypical and again encouraged Mr. Shaw to limit himself to nothing stronger than anti-inflammatories for pain management. Id. Again, Mr. Shaw does not dispute that Dr. Kalo wrote this letter or the content of the letter, but Mr. Shaw asserts he did not receive this letter and knew nothing of it until it was produced during this lawsuit.

On August 7, 2015, a UM was requested and approved for an MRI of Mr. Shaw's lumbar spine. The record does not reveal who requested or approved this UM. Docket 51-3, pp. 27-28. The MRI was performed on August 19, 2015, and revealed disc dehydration and degenerative spondylosis at L4-5 and L5-S1 without appreciable central or lateral foraminal stenosis or nerve root impingement. Docket 51-2, pp. 37-38.

Dr. Regier approved a "lay in" order for one week for Mr. Shaw on October 8, 2015. Docket 51-1, p. 69. Mr. Shaw saw Dr. Regier on October 28, 2015, in prison health services. Docket 51-1, pp. 70-71. Dr. Regier reviewed the recent MRI of the low back and reviewed Mr. Shaw's history of "scopes" on both knees, as well as the large osteochondroma on the right knee. Id. Dr. Regier did not believe the results of Mr. Shaw's lumbar MRI explained the symptoms Mr. Shaw was describing. Id. Dr. Regier submitted a UM for an orthopedic consult regarding Mr. Shaw's ongoing bilateral knee pain and his low back pain. Docket 51-1, p. 29. Dr. Carpenter approved this UM on October 30, 2015. Id.

As a result of Dr. Regier's UM, Mr. Shaw returned to Dr. Kalo at CORE Orthopedics. Docket 51-2 at p. 39. Dr. Kalo again stressed that he did not specialize in the treatment of spine issues. Id. But because Mr. Shaw complained of increasing pain in the right knee, Dr. Kalo recommended and administered an injection in the right knee. Id. at pp. 39-40.

On November 19, 2015, Mr. Shaw underwent X-rays of his left and right knees at prison health services. Docket 51-1 at pp. 72-73. The films showed

mild degenerative changes when compared with the earlier bilateral knee studies.  Id.

A health services note dated November 23, 2015, indicates a medical provider has ordered a pillow, ice and warm packs as needed.  Docket 51-1, pp. 76-80.  No duration of this order is indicated.  Id.

On December 7, 2015, a UM was submitted for an orthopedic consult with Dr. Venner from CORE Orthopedics.  This UM was approved.  It cannot be determined who submitted the request, when it was approved, or who approved it.  Id.

Mr. Shaw saw Dr. Alvine from CORE Orthopedics on February 22, 2016. Docket 51-2, p. 41.  Mr. Shaw described back pain beginning with a fall in the shower in April, 2015.  Id.  Dr. Alvine reviewed the films which showed degenerative changes.  Id.  Dr. Alvine advised Mr. Shaw that there was not a good surgical intervention for his low back pain, but Dr. Alvine recommended physical therapy.  Id.  Dr. Alvine advised to let him know if Mr. Shaw had questions, concerns or worsening symptoms.  Id.

On March 7, 2016, a UM was submitted and approved for physical therapy at Avera Therapy.  Docket 51-3 at p. 32.  On April 29, 2016, another UM was submitted and approved for physical therapy at Avera Therapy.  Id. at p. 33.  Mr. Shaw alleges he participated in physical therapy but it made his back pain worse.  In mid-May, 2016, Mr. Shaw's medical orders were reviewed. Docket 51-1, pp. 84-85.  His orders for med ice and an extra pillow were not renewed but his orders for knee braces and a HOB wedge were renewed.  Id. at

p. 85.  The explanation given was that "will not renew ice or pillow.  Pillow is a comfort item and needs to discuss with DOC, do not give long-term ice orders.  Will renew HOB wedge and knee brace orders."  Id.

On July 13, 2016, a UM was submitted and approved for an injection of Mr. Shaw's lumbar spine with Dr. Lockwood at Avera Pain Clinic.  Docket 51-3, p. 34.  On July 26, 2016, Mr. Shaw's no-stair order was renewed.  Docket 51-3, p. 35.  On August 2, 2016, a UM request was submitted by an unknown medical provider for the replacement of bilateral knee braces that were lost when Mr. Shaw went to the SHU.  The braces were to be replaced by O & P Specialties.  Docket 51-3, p. 36.  This UM was approved.  Id.

On September 1, 2016, Mr. Shaw visited O & P to be measured for bilateral knee braces.  Docket 51-2, pp. 44-48.  He returned on September 23, 2016, for a fitting for the new braces.  Id.  Sleeves were also ordered by O & P at another appointment on October 17, 2016.  Id.  Mr. Shaw went to O & P again on December 8, 2016, for further adjustments to both knee braces.  Id.  Additionally, impressions were taken at O & P for custom foot orthotics with medical wedges.  Id.  Mr. Shaw does not dispute any of these statements, but indicates that as of August 9, 2017, he still had not received the custom foot orthotics with medical wedges.

## 2.    Interference With Mail And Retaliation Claims.[9]

Mr. Shaw asserts the defendants retaliated against him after he requested to review his medical records and subsequently filed this lawsuit

---

[9] Because these claims are intertwined, the facts are combined.

against the named defendants. He asserts the defendants intercepted mail from Dr. Kalo at CORE Orthopedics, and retaliated against him by placing him in the SHU with no explanation and by taking his personal property without due process. <u>See</u> Docket 41 ¶¶ 161-190.

Regarding Mr. Shaw's interference with mail claim, it appears that Mr. Shaw wrote to Dr. Kalo on May 3, 2015, and then again shortly before July 9, 2015, inquiring about his medical condition. See Docket 51-2, p. 34 and p. 36. These dates both pre-date when Mr. Shaw filed or served this pending lawsuit. <u>See</u> Docket 1.

The defendants have explained that in the ordinary course, an inmate does not obtain access to outside medical records during a medical records review. <u>See</u> Docket 51-1, pp. 87-90 (SDDOH Policy P-H02A). Instead, the inmate's medical file is pulled and prepared for review by removing any information the inmate is not allowed to access, such as outside records, mental health records, UM requests, and dates of future appointments. An appointment is then made for the inmate to come to the health services department to review his records. If an inmate wishes to obtain outside medical records, he must request them directly from the outside provider. Docket 51-1, p. 87. Though not an official policy, the inmate is directed to "kite" health services to alert them that the records will be coming. Heather Bowers Affidavit (Docket 66) ¶ 13. This way, the health services department will know to watch for the outside records for that particular inmate in order to ensure they are reviewed for security purposes to remove appropriate

information (future appointments) and then forwarded to the appropriate inmate.  Id.  If Ms. Bowers is notified of such a request, she makes a notation in the nursing notes.  She does not recall receiving such a notation from Mr. Shaw.  Docket 55, ¶ 13.  Likewise, neither Dr. Carpenter, nor Associate Warden Ponto had any involvement in Mr. Shaw's request for records from outside medical providers.  Carpenter Affidavit, Docket 58 ¶ 7; Ponto Affidavit, Docket 60, ¶ 11.

In his complaint, Mr. Shaw makes reference to his correspondence to Dr. Kalo and that he tried to obtain Dr. Kalo's records from health services personnel (Docket 41, ¶¶  126, 161-175.  In his complaint, however, Mr. Shaw does not allege that he followed the procedure outlined above for obtaining outside medical records directly from an outside provider.  In his response to the defendants' statement of undisputed facts, Mr. Shaw asserts that he did follow the procedure (Docket 109, ¶ 11).  In his response to the defendants' statement of undisputed facts, however, though Mr. Shaw asserts he followed the appropriate procedure, he does not specify that he notified any of the named defendants that he had requested outside records from Dr. Kalo, or when such notification was made.

The only indication the court has found in the record is a record dated in July, 2015 (after both of Dr. Kalo's letters were written).  See Docket 51-1, p. 66.  That docket entry appears to be a note in the medical record by a person named Stephen Willison, and indicates Mr. Shaw was inquiring about receiving outside medical records that he had requested.  Id.

Inmates must pay a $2.00 co-pay for the visit to health services to review their records, plus the usual charge for copies if they wish to make copies. However, they may view their records and take notes at no cost other than the $2.00 co-cay. Heather Bowers Affidavit, Docket 66, ¶ 6 ; Docket 51-1, pp. 87-90.

Mr. Shaw requested to review his medical records several times in November, 2015. See Docket 109-28; (Mr. Shaw's "kite" dated November 9, 2015, requesting to see records); Docket 51-1, p. 74 (Mr. Shaw's "kite" dated November 20, 2015 requesting to see records); Docket 51-5 (timeline prepared by Jessica Schreurs). Though he had already filed his complaint in this action at that time, it had not been served upon any of the named defendants. And, by that time, Mr. Shaw had already received copies of his medical records at least once in March, 2014. Bowers Affidavit, ¶ 10. Docket 61, ¶ 10.

On November 23, 2015, Mr. Shaw was placed in the SHU. The reason for Mr. Shaw's placement in the SHU is hotly contested by the parties. The defendants assert Mr. Shaw was placed in the SHU because it was suspected he had removed items from his institutional medical chart without permission. Mr. Shaw asserts he was placed in the SHU as retaliation for exercising his constitutional right to access the courts to bring this lawsuit regarding deliberate indifference to his serious medical needs.

Before any of the defendants in this lawsuit were served with suit papers, on December 17, 2015, non-defendant Jessica Schreurs authored a document which was placed in Mr. Shaw's medical chart regarding events relevant to

Mr. Shaw's medical file. Schreurs Affidavit, Docket 57, ¶ 5. Mr. Shaw asserts

Ms. Schreurs fabricated this document to justify the defendants' retaliation

against him.

The dictation placed in Mr. Shaw's chart by Ms. Schreurs on December

17, 2015 regarding the status of Mr. Shaw's medical records states as follows:

Late entry:
11/09/15 the patient kited requesting to review his medical
records. He submitted repeated requests to review his medical
records on 11/13/15, 11/16/15, 11/18/15 and 11/20/15.
On 11/10/15 Kristine Wiersma with medical records discovered
the patients chart was out of order with random papers,
specifically mental health papers and outside records pulled to the
front of the chart.

11/21/15 Heather Bowers RN made aware that the provider
dictations are unable to be located. Over the next week Heather
Bowers RN, Kristine Wiersma Medical Records and Rosie Rand
went through all four of the patients chart attempting to locate the
missing records. Jessie Rand searched Jameson health services to
see if the patient had an additional thinned chart down there. She
was unable to locate an additional chart.

11/24/15 I was approached by Heather Bowers RN to determine
what the next step would be. I called Unit Manager Dittmanson
and asked that a cell search would be completed on Mr. Shaw an
attempt to locate the missing records at 1400. At approximately
1545 SCO Howe brought me a folder contained 102 pages of
medical records. There were 9 original signed provider dictations
from the following dates 08/02/10, 08/24/11, 10/2/12, 11,7.12,
7/3/13, 9/3/13, 7/10/14, 8/28/14, 12/11/14, and one original
UM for an orthopedic surgical consult from 2/6/10. The original
documents were on #11 pages of paper.

11/25/15 I approached AW Ponto requesting that special security
complete an investigation into how the patient obtained original
internal records.

12/01/15 AW Ponto notified this writer that the patient reports he
obtained all the confiscated records from an outside provider. I
notified AW Ponto that this was not a possibility as the original

36

documents were internal provider documents that were signed. The outside provider would not have had access to these records.

12/01/15 Notified Kayla Tinker and Melissa Johnson of the situation who advised me clearly indicate what records were original and to develop timeline of events.

12/02/15 Met with AW Ponto, Heather Bowers RN and Mr. Shaw. Patient reports he received the documents from Nurse Melissa. Informed patient that Nurse Melissa has not worked for the department in several years and the most recent original document was dated from 12/2014 and that I needed to know how he obtained the records. He then reports he took the records while completing a chart review. He reports that medical provided him with the chart to review in the waiting room at his request with the officer watching him. He reports that SCO Smith had to step away and he took the records.

12/17/15 Called patient to health services to return # 91 non original documents to patient. I informed him that I was returning all non-original documents but that he would not receive the originals back. Patient verbalized understanding. He reports he has more original documents in his cell. I requested that the patient return all original documents. He brought up the following: original provider dictation from 01/03/2007, original provider dictation 04/15/2008, original provider dictation 07/02/2009. This was a total of 5 pages. I offered the patient to provide him copies of these specific records and he declined stating he had copies of these records. Notified AW Ponto of the additional original records obtained from the patient.

Mr. Shaw denies he stole the medical records and denies that he admitted stealing the records. Docket 109, ¶¶ 14-19. Mr. Shaw correctly notes that his medical chart review under the supervision of SCO Smith did not occur until **December 4, 2015**. Docket 51-1, p. 81. The entry for this medical record review is difficult to read, but does clearly indicate that Officer Smith was involved in Mr. Shaw's chart review on December 4, 2015.

Therefore, Mr. Shaw asserts, it does not make sense that Mr. Shaw could have admitted to having stolen original records from his medical chart during

SCO Smith's watch during the chart review on December 4, 2015, which was **after** the time Kristine Wiersma noticed the records were missing and **after** the time Mr. Shaw was placed in the SHU for investigative purposes, allegedly for suspicion of stealing the medical records during a chart review which had not yet occurred.

Recall, Mr. Shaw he was placed in the SHU, allegedly for suspicion of stealing the records, on **November 23 of 2015**.  See, Docket 51-4, p. 1; Docket 51-5; Docket 57, ¶ 10.  Ms. Schreurs' timeline indicates it was she who requested the search of Mr. Shaw's cell.  Docket 51-5.  The officer who searched the cell, however, indicated that "per Ponto" he (Officer Ekeron) was instructed to "look for medical paperwork that [Mr. Shaw] was not supposed to have."  Docket 51-4, p. 1.

At the time Mr. Shaw was placed in the SHU and the medical records were taken from his cell, this lawsuit had been **filed**, but it had not yet been **served** upon the defendants.  Mr. Shaw did, however, on November 20, 2015, notify "health services" that he was currently filing an amended complaint and that was the reason he needed to see his medical records.  Docket 51-1, p. 74. On November 24, 2015, Officer Ekeron was instructed by Associate Warden Ponto to look for "medical paperwork" that Mr.  Shaw was "not supposed to have."  Docket 51-4, p. 1.  Mr. Shaw alleges that along with medical records, a draft copy of his amended complaint was also confiscated and never returned. Docket 41, ¶ 185.  Because of the vagueness of the request by AW Ponto,

Officer Ekeron took <u>all</u> the medical records from Mr. Shaw's cell. Docket 51-4, p. 1.

According to the defendants, some of these medical records (non-originals which Mr. Shaw was entitled to have) were later returned to him. Docket 51-5; Schreurs Affidavit, Docket 57, ¶ 13. In his complaint, Mr. Shaw explains that some of his property was returned to him, but some property was never returned to him, including law books, legal cases, medical records, and a draft of his complaint. Docket 41, ¶ 185.

Mr. Shaw later filed a small claims lawsuit to recover the value of "personal property" and "monies" he alleged were wrongfully taken from him. The named defendant was Daren Young. Docket 51-6. In that small claims lawsuit, Mr. Shaw claimed Warden Young and his "subordinates" wrongfully took personal property and money from him on two occasions. <u>Id.</u> Defendant Derrick Bieber submitted an affidavit indicating he attended and testified at the small claims hearing in state court. Docket 54, ¶ 11. Neither the small claims paperwork nor Mr. Bieber's affidavit clarify whether the medical records which the defendants claim were returned to Mr. Shaw but which Mr. Shaw claims were not returned was an issue in the small claims action. The small claims court ruled against Mr. Shaw. Docket 51-6, p. 3.

## ANALYSIS

### A.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Anderson, 477 U.S. at 256; Fed. R. Civ. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual

disputes that are irrelevant or unnecessary will not be counted." Id. (citing 10A

Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Practice &

Procedure, § 2725, at 93–95 (3d ed. 1983)). "[T]he mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact." Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a

proper jury question is presented: "The inquiry performed is the threshold

inquiry of determining whether there is the need for a trial—whether, in other

words, there are any genuine factual issues that properly can be resolved only

by a finder of fact because they may reasonably be resolved in favor of either

party." Id. at 250. Though *pro se* litigants like Mr. Shaw are entitled to a

liberal construction of their pleadings, FED. R. CIV. P. 56 remains equally

applicable to them. Quam v. Minnehaha Co. Jail, 821 F.2d 522 (8th Cir.

1987). This includes the requirement that Mr. Shaw respond to defendants'

"motion with specific factual support for his claims to avoid summary judgment."

Beck v. Skon, 253 F.3d 330, 333 (8th Cir. 2001). The district court is not required

to "plumb the record in order to find a genuine issue of material fact." Barge v.

Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996). Courts must remain

sensitive, however, "to the special problems faced by prisoners attempting to

proceed *pro se* in vindicating their constitutional rights, and [the Eighth Circuit

does] not approve summary dismissal of such *pro se* claims without regard for

these special problems." Nickens v. White, 622 F.2d 967, 971 (8th Cir. 1980).

"When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." Ross v. Franzen, 777 F.2d 1216, 1219 (7th Cir. 1985).

The failure by an opposing party to properly resist summary judgment "does not automatically compel resolution of [the motion] in favor of" the movant. United States v. One Parcel of Real Property, 27 F.3d 327, 329 n.1 (8th Cir. 1994); Canada v. Union Elec. Co., 135 F.3d 1211, 1213 (8th Cir. 1997). Federal Rule of Civil Procedure 56(e) allows for the possibility that a party may fail to resist another party's assertion of fact. When this happens, the court must still make a determination as to whether the moving party is entitled to judgment in her favor on the merits. One Parcel of Real Property, 27 F.3d at 329 n.1. See also Fed. R. Civ. P. 56(e)(3) (upon a party's failure to contest facts asserted by the movant, the district court may grant summary judgment *if* the facts and the law show that the movant is entitled to judgment in her favor).

## B. Qualified Immunity

Defendants assert that they are entitled to qualified immunity and, therefore, the court should enter summary judgment in their favor. In addition, they argue that Mr. Shaw cannot make out a constitutional violation, also entitling them to summary judgment.

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Shaw must show (1) defendants acted under color or state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected federal right.' "

Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is immunity from suit, not just a defense to liability at trial. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Therefore, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 236 (1991).

To determine whether an official may partake of qualified immunity, two factors must be determined: (1) whether the facts that plaintiff has shown make out a violation of a constitutional right and (2) whether that constitutional right was "clearly established" at the time of the official's acts. Saucier v. Katz, 533 U.S. 194, 201 (2001). If the court finds that one of the two elements is not met, the court need not decide the other element, and the court may address the elements in any order it wishes "in light of the circumstances of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). Defendants are entitled to qualified immunity if the answer to either of the Saucier prongs is "no."

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Stanton v. Sims, 571

43

U.S. ___, 134 S. Ct. 3, 5 (2013) (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743, (2011) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986))). " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " <u>Stanton</u>, 134 S. Ct. at 5. " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " <u>Ambrose v. Young</u>, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting <u>Hunter</u>, 502 U.S. at 229).

The Supreme Court has stated that "if the defendant does plead the [qualified] immunity defense, the district court should resolve that threshold question before permitting discovery." <u>Crawford-El v. Britton</u>, 523 U.S. 574, 598 (1998) (citing <u>Harlow</u>, 457 U.S. at 818). Only if the plaintiff's claims survive a dispositive motion on the issue of qualified immunity will the plaintiff "be entitled to some discovery." <u>Id.</u> Even then, the Court has pointed out that FED. R. CIV. P. 26 "vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." <u>Id.</u> Such discretion includes the ability to establish limits on the number of depositions and interrogatories, to limit the length of depositions, to limit the number of requests to admit, to bar discovery on certain subjects, and to limit the time, place, and manner of discovery as well as its timing and sequence. <u>Id.</u> In this case, the defendants moved for a protective order to stay discovery on December 2, 2016. Docket 44. The district court granted the motion on January 31, 2017, 2016. Docket 62. The district court, however, exempted

from the stay on discovery certain medical and other records it deemed necessary to determine whether the defendants were entitled to claim qualified immunity.  Id.

The court addresses one final matter regarding qualified immunity.  In his brief, Mr. Shaw asserts Dr. Carpenter, Dr. Regier, and Heather Bowers are not entitled to qualified immunity because (among other reasons) they are private contractors, not state employees.  See Docket 108, p. 4.  Though Dr. Carpenter was for a time a private contractor, at all times pertinent to this lawsuit (i.e. from July 9, 2012, forward),[10] she was a state employee.  See Carpenter Affidavit, Docket 58, ¶¶ 1 & 3.  Likewise, at all times pertinent to this lawsuit, Dr. Regier and Heather Bowers have been state employees.  See Regier Affidavit, Docket 113, ¶ 3; Bowers Affidavit, Docket 66, ¶ 3.  As such, assuming they are otherwise entitled to qualified immunity, these persons would be entitled to partake of qualified immunity as it pertains to their treatment of Mr. Shaw because they were state actors.  See Zutz, 601 F.3d at 848 (qualified immunity applies if the defendant was acting under color of state law).  For this reason the court declines to decide whether these persons would have been precluded from partaking in qualified immunity if they had not been state employees during the relevant time frame.

## C.    Statute of Limitations

The defendants also assert that some of Mr. Shaw's claims are barred by the applicable statute of limitations.  There is no federal statute of limitations

[10] This date is the relevant start date for the reason explained in Section C, below.

for actions brought under 42 U.S.C. § 1983, so courts are directed to adopt a local statute of limitations for analogous causes of action "if not inconsistent with federal law or policy to do so." See Wilson v. Garcia, 471 U.S. 261, 266-67 (1985). The Garcia Court held that, for § 1983 actions, the most analogous state limitations period was the limitations period applicable to personal injury actions. Id. at 280.

Garcia was partially superseded by passage of a "catch-all" statute of limitations for federal actions. See 28 U.S.C. § 1658, as recognized in Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 377-81 (2004). If a plaintiff's claim "arises under" a federal statute that was enacted by Congress after 1990, then a four-year statute of limitations applies. See 28 U.S.C. § 1658. Although § 1983 was amended after 1990 (in 1996), those amendments have to do with immunity for judicial officers from injunctive relief. See 42 U.S.C. § 1983. Thus, actions such as Mr. Shaw's claim do not "arise under" the 1996 amendments. See Williams v. Hawkeye Community College, 494 F. Supp. 2d 1032, 1038 (N.D. Iowa 2007). Accordingly, Garcia continues to control the analysis. DeVries v. Driesen, 766 F.3d 922, 923-24 (8th Cir. 2014); Williams, 494 F. Supp. 2d at 1038.

South Dakota enacted a specific three-year statute of limitations for federal civil rights actions. See SDCL § 15-2-15.2. The state's limitations period for personal injury actions is identical: three years. See SDCL § 15-2-14(3). So, applying either statute, Mr. Shaw had three years "after the alleged constitution deprivation has occurred" to bring suit. See

SDCL § 15-2-15.2.  In order to apply the statute, the court must first determine (1) when Mr. Shaw's claim accrued and (2) whether the limitations period should be tolled.

### 2.    Mr. Shaw's Claim Accrued at the Latest in 2010

Unlike the issue of the limitations period, the accrual of a § 1983 action is determined by reference to federal law, not state law.  Wallace v. Kato, 549 U.S. 384, 388 (2007).  The issue of when to toll a limitations period is decided with reference to state law.  Wallace, 549 U.S. at 388, 394.

A § 1983 action accrues "when the plaintiff has 'a complete and present cause of action,' that is, when 'the plaintiff can file suit and obtain relief.' " Id. (citations omitted).  In Wallace, the plaintiff, Andre Wallace, had been arrested without probable cause in 1994.  Id. at 386.  He was later convicted of first-degree murder and sentenced to 26 years in prison.  Id.  Wallace overturned his conviction on appeal on the basis that his arrest lacked probable cause.  Id. The appellate court issued its opinion on August 31, 2001.  Id. at 387. Prosecutors dropped the charges against Wallace on April 10, 2002.  Id. Wallace filed his § 1983 action on April 2, 2003.  Id.  Defendants succeeded in obtaining dismissal of Wallace's suit on the basis of untimeliness.  Id.

Illinois had a two-year statute of limitations applicable to Wallace's § 1983 action.  Id.  Thus, if his cause of action accrued upon the appellate court issuing its opinion or upon dismissal of the charges, then Wallace's filing of his lawsuit was timely.  Id.  If, however, it began to run when he was first taken into custody, then his lawsuit was untimely.  Id. at 387-88.

In determining when Wallace's cause of action accrued, the court made reference to "federal rules conforming in general to common-law tort principles." Id. at 388. Wallace's action was one premised on unlawful detention, so the court made reference to common-law tort rules regarding the torts of false arrest and false imprisonment. Id. Under the common law, false arrest and false imprisonment are premised on detaining someone without legal process. Id. at 389-90. It follows, then, that these torts end at the time that one's detention becomes pursuant to legal process. Id. At that point, the continued detention is pursuant to either malicious prosecution or wrongful use of judicial process, not from false imprisonment. Id.

In Wallace, once Wallace was brought before a magistrate judge and legal process was initiated against him, his false imprisonment ended and his cause of action accrued. Id. at 390. Since that was in 1996 and Wallace did not bring suit until 2002, his suit was brought outside the two-year statute of limitations. Id. at 391-92. This was true even though a timely-filed suit might have entitled Wallace to damages for the entire time he was incarcerated. Id.

Other courts have explained that under federal law, a cause of action under § 1983 accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action." Lavellee v. Listi, 611 F.2d 1129, 1131 (5th Cir. 1980) (citing Cox v. Stanton, 529 F.2d 47, 50 (4th Cir. 1975)). See also, Combs v. Nelson, 419 Fed. Appx. 884, 886 (11th Cir. 2011) (a § 1983 cause of action accrues and the statute of limitations begins to run when "the facts which would support the cause of action are apparent or should be

apparent to a person with a reasonably prudent regard for his rights.")(citing Mullinax v. McElhenney, 817 F.2d 711, 716 (11th Cir. 1987)).

In this this case, Mr. Shaw's cause of action for deliberate indifference (at least as to his right knee) accrued in March, 2010.  After the MRI in 2008 of Mr. Shaw's right knee showed the meniscal tear, Dr. Zoellner  recommended surgery on Mr. Shaw's right knee in October, 2009.  But the Medical Director denied the UM for surgical repair in March, 2010.  As of that date, Mr. Shaw knew or had reason to know that the failure to follow the orthopedists' recommendations as to the treatment of his right knee could constitute deliberate indifference.

## 2.     Tolling Does Not Apply

Absent some sort of fraudulent concealment on the part of a defendant, South Dakota has refused to adopt the "discovery rule" to toll the statute of limitations in personal injury actions.  See Beckel v. Gerber, 1998 S.D. 48, ¶ 9, 578 N.W.2d 574, 576; Alberts v. Giebink, 299 N.W.2d 454, 455 (S.D. 1980) (plaintiffs urged the adoption of a discovery rule in medical malpractice actions and court refused).  Therefore, it is unlikely that the South Dakota court would change a holding that is decades old and has continued to be reaffirmed repeatedly.

In Sisney v. Best, Inc., 2008 S.D. 70, ¶¶ 1-5, 754 N.W.2d 804, 807, an inmate at the South Dakota State Penitentiary brought a § 1983 action in state court alleging that the state violated his constitutional rights by providing food that was represented to be "kosher," but which was not.  Defendant Best last

provided food to the prison on July 31, 2002.  Id. at ¶ 2, 754 N.W.2d at 807.

Sisney brought suit on May 14, 2007, well outside the three-year limitations

period.  Id. at ¶ 9, 754 N.W.2d at 809.  Although Sisney tried to invoke the

tolling doctrine of SDCL § 15-2-3, the court rejected this argument, noting that

Sisney had not pleaded fraud.  Id. at ¶ 10, 754 N.W.2d at 807.

Whether the state would adopt a discovery rule for federal civil rights

actions need not be definitively answered, however, for the facts alone defeat

Mr. Shaw's claim that he did not "discover" the facts giving rise to his lawsuit

until the date he started his lawsuit.  Though Mr. Shaw asserts Dr. Regier hid

Dr. Hermanson's 2008 option for surgical removal of the osteochondroma, the

record belies this assertion.  And Mr. Shaw himself admits that he knew of the

option because he now claims that though he told Dr. Hermanson during the

office visit he did not want the procedure, he later changed his mind after her

returned to his cell.  Whether he did or did not later change his mind,

Mr. Shaw's assertion that he changed his mind defeats his claim that

Dr. Regier hid Dr. Hermanson's recommendation for surgery.

Likewise, Dr. Zoellner's October 9, 2009, note clearly indicates that

Mr. Shaw knew of that recommendation for surgery and that he consented to

the surgery.  Mr. Shaw cannot prevail, therefore, on any claim that Dr. Regier

or any of the other defendants fraudulently concealed the fact that this

surgery, which was denied in March, 2010, had been recommended, but that it

was denied by the Medical Director.

Mr. Shaw knew at least by March of 2010, of the facts necessary to assert a deliberate indifference claim as to the state defendants' refusal to follow outside providers recommendations regarding the treatment of his right knee—he knew that surgery on his right knee had been recommended by Dr. Zoenller but that it had been denied by the Medical Director. At that time, Mr. Shaw could have brought this suit. He knew of his potential "injury" – deliberate indifference to his medical needs--back in 2010. Mr. Shaw did not, however, commence this suit until the he filed his complaint until July 9, 2015. As explained above, the statute of limitations for civil rights actions in South Dakota is three years. Mr. Shaw may only recover damages, therefore, for any acts of deliberate indifference stretching back three years from July 9, 2015, or in other words, beginning on July 9, 2012.

Mr. Shaw asserts the doctrine of continuing treatment or continuing tort should prevent the statute of limitations from ***ever*** beginning to run, thereby allowing him to assert the intermittent actions of the defendants for the entire course of their treatment of him as the basis for his claims. This argument has been soundly rejected, however, as it pertains to deliberate indifference claims arising under § 1983. "The continuing tort theory would not benefit the plaintiff in this context because it has been found that, with claims of episodic deliberate medical indifference, 'each instance of potentially deliberate indifference ceases when the plaintiff receives medical attention.' " Parker v. Webber, 2014 WL 1057189 at *5, n.3 (M.D. La., Mar. 19, 2014)(citing Nottingham v. Richardson, 499 Fed. Appx. 368, 375 (5th Cir. 2012)). And, in

Nottingham, the court noted that the "continuing tort doctrine is one of accrual and thus a question of federal, rather than state law." Nottingham, Id.

**D.  Deliberate Indifference**

In his complaint, Mr. Shaw indicates this claim is brought against defendants Ponto, Madsen, Badure, Bieber, Glaser, Carpenter, Regier, Bowers and Shedd.  Docket 41, p. 22.  The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment.  Allard v. Baldwin, 779 F.3d 768, 771 (8th Cir. 2015).  That prohibition includes prison officials' deliberate indifference to the medical needs of inmates.  Id.  That is because "deliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Id. at 104-05.

"[T]his does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  Id. at 105.  "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Id. at 106.  Allegations of negligence, even gross negligence, are not enough to state a claim.  Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)

(prisoner must show more than gross negligence and more than disagreement with treatment decisions).

Deliberate indifference requires the court to make both an objective and a subjective evaluation. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahja, 114 F.3d 778, 784 (8th Cir. 1997)). Mr. Shaw is required to show (1) that he suffered objectively serious medical needs and (2) that defendant actually knew of but deliberately disregarded those needs. Id. (citing Coleman, 114 F.3d at 784). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Coleman, 114 F.3d at 784. To establish liability, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). A plaintiff asserting deliberate indifference "must show more than even gross negligence"—he "must establish a 'mental state akin to criminal recklessness: disregarding a known risk to the inmate's health.'" Allard, 779 F.3d at 771-72.

"[A] total deprivation of care is not a necessary condition for finding a constitutional violation: 'Grossly incompetent or inadequate care can [also] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment.'" Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) (quoting Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990)). A plaintiff can also show deliberate indifference by demonstrating that a

53

defendant denied access to or intentionally delayed medical care.  Allard, 779 F.3d at 772.

The court begins with defendant Shedd.  The only allegation Mr. Shaw makes against defendant Shedd is that in July, 2012, she issued a medical order stating that the ice provided under prior medical orders was a "comfort item" and it was no longer medically necessary.  Docket 41, ¶ 45.  There was an order entered on this date stating "ice at HS for comfort measure.  Not medically necessary."  Docket 51-1, p. 28.  The signature is illegible.  Nurse Shedd, however, has submitted an affidavit explaining that she was not even working at that time because she was on maternity leave.  Docket 53, ¶ 6.  The court therefore recommends that summary judgment be GRANTED as to defendant Shedd.

If a reviewing court disagrees with the above conclusion (i.e. that Nurse Shedd's treatment of Mr. Shaw did not rise to the level of deliberate indifference), then the court alternatively recommends summary judgment be granted to Nurse Shedd because she is entitled to partake of qualified immunity.  " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' "  Ambrose, 474 F.3d at 1077 (quoting Hunter, 502 U.S. at 229).  Nurse Shedd's treatment of Mr. Shaw transgressed no bright lines.  Alternatively, therefore, Nurse Shedd is entitled to qualified immunity.

The other non-physician medical defendant against whom Mr. Shaw brings his deliberate indifference claim is Nurse Heather Bowers.  Mr. Shaw

asserts defendant Bowers refused to give him a no-stair or med shower order (Docket 41, ¶ 118) and that she refused to submit a request for a UM for adjustments to his knee brace (Id. ¶ 123).  Mr. Shaw also asserts Ms. Bowers told him she thought he was "faking it."  Id. ¶ 137.

Ms. Bowers, however, has submitted an Affidavit explaining that medical orders such as "no stair" orders  must come from medical providers, not the nurses.  Bowers Affidavit, Docket 66, ¶ 14.  Further, an inmate cannot get a "med shower" unless the inmate first has a "no stair" order or an open wound. Id.  Ms. Bowers has also explained that providers order "med ice."  Id. ¶ 15.  If there is a medical indication for med ice or extra pillows health services can provide a recommendation for those items, but if they are long term, they are considered "comfort" items.  Id.  Ms. Bowers has explained that as a nurse, she does not have the authority to enter an order for the adjustment of Mr. Shaw's knee brace.  Such an order must come from a medical provider.  Id. ¶ 16. (Ms. Bowers never explains exactly what she means by "provider" but this court assumes she means physician or physician's assistant, because the UMs in the record were submitted by physicians or physician's assistants).   Finally, as to Mr. Shaw's concerns whether Ms. Bowers believes he is faking, she explains it is her job to follow the providers' orders.  Id. ¶ 17.  She does not have the ability to alter a doctor's orders based upon whether she believes the patient is faking.  Based upon Mr. Shaw's documented condition, one would expect symptoms of pain.  Id.  Mr. Shaw has not submitted admissible evidence to counter these submissions from Ms. Bowers.  The court therefore recommends

that the defendants' summary judgment motion regarding deliberate indifference as to Ms. Bowers be GRANTED.

If a reviewing court disagrees with the above conclusion (i.e. that Nurse Bower's treatment of Mr. Shaw did not rise to the level of deliberate indifference), then the court alternatively recommends summary judgment be granted to Nurse Bowers because she is entitled to partake of qualified immunity. " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " <u>Ambrose</u>, 474 F.3d at 1077 (quoting <u>Hunter</u>, 502 U.S. at 229). Nurse Bowers' treatment of Mr. Shaw transgressed no bright lines. Alternatively, therefore, Nurse Bowers is entitled to qualified immunity.

The next group of defendants against whom Mr. Shaw alleges deliberate indifference are non-medical prison officials who would not give him access to a handicap cell upon his return from the surgery on his left knee in March, 2015. These are: Unit Coordinator Glaser, Unit Manager Madsen, Unit Manager Badure, and Associate Warden Ponto. The record does not reveal, however, that Mr. Shaw ever had a medical order for a handicap cell. Nor does it appear from the record that a handicap cell was so obviously necessary that even a lay person would have recognized the need. The court cannot find deliberate indifference on the part of any of these defendants on this basis. The court recommends summary judgment be GRANTED as to Unit Coordinators Glaser and Badure (there are other deliberate indifference claims

against Madsen and Ponto so they are discussed later) regarding Mr. Shaw's deliberate indifference claim.

If a reviewing court disagrees with the above conclusion (i.e. that Unit Coordinators Glaser and Badure's treatment of Mr. Shaw did not rise to the level of deliberate indifference), then the court alternatively recommends summary judgment be granted to them because they are entitled to partake of qualified immunity. " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " <u>Ambrose</u>, 474 F.3d at 1077 (quoting <u>Hunter</u>, 502 U.S. at 229). Unit Coordinator Glaser and Badure's treatment of Mr. Shaw transgressed no bright lines. Alternatively, therefore, they are entitled to qualified immunity.

Likewise, Mr. Shaw asserts Unit Manager Bieber was deliberately indifferent to Mr. Shaw's medical needs because Mr. Bieber refused to give Mr. Shaw a "no stair" order. The defendants, however, have explained, and Mr. Shaw has produced no evidence or legal authority to dispute, that non-medical prison personnel do not have the authority to issue "no stair" orders. Bowers Affidavit, Docket 66, ¶ 14; Bieber Affidavit, Docket 54, ¶ 6. The court cannot find deliberate indifference of Unit Manager Bieber on this basis. The court recommends summary judgment be GRANTED as to Unit Manager Bieber regarding Mr. Shaw's deliberate indifference claim.

If a reviewing court disagrees with the above conclusion (i.e. that Unit Manager Bieber's treatment of Mr. Shaw did not rise to the level of deliberate indifference), then the court alternatively recommends summary judgment be

granted to Unit Manager Bieber because he is entitled to partake of qualified immunity as to this claim. " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " <u>Ambrose</u>, 474 F.3d at 1077 (quoting <u>Hunter</u>, 502 U.S. at 229). Unit Manager Bieber's treatment of Mr. Shaw transgressed no bright lines. Alternatively, therefore, Unit Manager Bieber is entitled to qualified immunity as to this claim.

Mr. Shaw asserts an additional basis for finding defendants Madsen and Ponto deliberately indifferent. Mr. Shaw was sent to the SHU for refusing housing after he was not given a handicap cell and refused housing that was offered after he returned to the SDSP following his March 9, 2015, left knee surgery. Mr. Shaw also alleges, however, that he specifically told Madsen and Ponto of his medical orders for ice, elevation, and pain meds, after he (Shaw) returned to the SDSP from the March 9 left knee surgery. Shaw alleges both of these individuals either ignored his pleas or refused to comply with the medical orders. Neither Mr. Madsen nor Mr. Ponto deny that there was a medical order in place for med ice, for Mr. Shaw to elevate his leg, and for pain medication during this time frame. <u>See </u>Docket 51-1, p. 50 (medical orders). Nurse Bowers has clarified that medical orders follow an inmate to the SHU. Bowers Affidavit, Docket 66, ¶ 15. Likewise, neither Mr. Madsen nor Mr. Ponto deny that they refused to provide Mr. Shaw with med ice, medication, or the ability to elevate his leg during this same timeframe. Madsen Affidavit, Docket 52; Ponto Affidavit, Docket 60.

Their only excuse for denying Mr. Shaw these items is that they did not know of the medical order.  But Mr. Shaw told them about it.  Apparently they did not bother to check with health services to confirm the existence of the order.  Mr. Shaw alleges that the failure by these defendants to follow the physicians' prescribed orders caused him (Shaw) "intense pain."  And, deliberate indifference can be shown not only by a physician's failure to respond appropriately, but also by other, non-medical prison officials, such as "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 104-05.  This law has been well established for decades.  The court therefore finds there is a genuine issue of material fact for trial as to whether defendants Ponto and Madsen were deliberately indifferent.  It is recommended that defendants Ponto and Madsen are not entitled to qualified immunity and defendants' summary judgment motion be DENIED as to defendants Ponto and Madsen on Mr. Shaw's deliberate indifference claim.

Mr. Shaw also asserts Dr. Regier was deliberately indifferent.  The court has reviewed the record beginning in July, 2012 and can find no instance of deliberate indifference on the part of Dr. Regier.  In fact, beginning in 2012, Dr. Regier consistently requested outside consults for Mr. Shaw to see the orthopedist and to get X-rays  and MRIs of his knees, and then for Mr. Shaw to receive the right knee surgery recommended by Dr. Kalo.  See e.g. Docket 51-3, pp. 11, 12, 13, 14.  When, after his left knee surgery, Dr. Kalo wrote a letter indicating Mr. Shaw should not climb stairs (see Docket 51-2, p. 36), Dr. Regier

entered a "no stair" order for Mr. Shaw.  <u>See</u> Docket 51-1, p. 68.  An MRI was recommended and performed to diagnose Mr. Shaw's low back pain.  No surgery has ever been recommended for Mr. Shaw's low back pain.  When, in 2016, Dr. Alvine recommended physical therapy to alleviate Mr. Shaw's low back pain, a UM was submitted and approved for physical therapy.  Docket 51-2 at p. 32.  When that did not alleviate his pain, a UM was submitted and approved for Mr. Shaw to try a lumbar spine injection at Avera Pain Clinic.  Docket 51-3, p. 34.

It is clear that Mr. Shaw remains dissatisfied with his medical care.  But that does not mean Dr. Regier was deliberately indifferent.  As the United States  Supreme Court explained in <u>Estelle</u>, a disagreement with a physician's treatment decisions does not rise to the level of an Eighth Amendment violation.  <u>Estelle</u>, 429 U.S. at 105-06.  The court recommends the defendants' summary judgment motion be GRANTED as to Dr. Regier on Mr. Shaw's deliberate indifference claim, because Mr. Shaw has failed to show that Dr. Regier was deliberately indifferent to Mr. Shaw's serious medical needs.

In the event that a reviewing court disagrees with the above conclusion (i.e. that Dr. Regier's treatment of Mr. Shaw did not rise to the level of deliberate indifference), then the court alternatively recommends summary judgment be granted to Dr. Regier because he is entitled to partake of qualified immunity.  " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " <u>Ambrose</u>, 474 F.3d at 1077 (quoting <u>Hunter</u>, 502 U.S. at 229).  Dr. Regier's treatment of  Mr. Shaw transgressed no

bright lines.  Alternatively, therefore, Dr. Regier is entitled to qualified immunity.

The final defendant against whom Mr. Shaw asserts deliberate indifference is Medical Director Mary Carpenter.  Beginning on July 9, 2012, and through the date Mr. Shaw filed this lawsuit, Dr. Carpenter denied one UM.  Carpenter Affidavit, Docket 58, ¶ 9.  That she only denied one UM, however, does not end the inquiry.  To establish liability, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).   To make this determination, one must view the facts (in a light most favorable to Mr. Shaw) which were available to Dr. Carpenter when she denied the UM for an orthopedic consultation on August 14, 2014.

First, there had been a long history of Mr. Shaw's knee problems, followed by a surgical procedure on Mr. Shaw's **right** knee in 2013.  That surgery revealed that the knee was severely arthritic and the ACL "obviously deficient."  The condition of that knee, including its arthritic condition and the loss of cartilage, precluded anything much other than "brace management" until many years down the road because of Mr. Shaw's young age.  In **July 2014**, an MRI was performed on Mr. Shaw's **left** knee.  It showed a complex macerated tearing of the lateral meniscus with little intact meniscus remaining and a chronic tear of the ACL, along with a questionable horizontal tear of the posterior horn of the medial meniscus and fairly significant cartilage defects of

the lateral femoral tibial compartment and mild degenerative changes of the patellofemoral compartment. Yet, despite the history of Mr. Shaw's **right** knee, and despite what the MRI of the left knee showed, Dr. Carpenter, on August 12, 2014, denied PA Manson's UM request for Mr. Shaw to return to Dr. Kalo for an orthopedic consultation. As a result, Mr. Shaw did not return to Dr. Kalo until **January, 2015** and did not have surgery on his left knee until **March 9, 2015**.

Granted, Dr. Carpenter approved the request for a UM to see Dr. Kalo when it was re-submitted to her in December, 2014. This allowed Mr. Shaw to finally see Dr. Kalo on a consult for his left knee in January, 2015 and have left knee surgery in March, 2015. But "a total deprivation of care is not a necessary condition for finding a constitutional violation: 'Grossly incompetent or inadequate care can [also] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment.' " Langford, 614 F.3d at 460 (quoting Smith, 919 F.2d at 93). A plaintiff can also show deliberate indifference by demonstrating that a defendant denied access to or intentionally delayed medical care. Allard, 779 F.3d at 772. This law has been clearly established for decades. This court finds that Dr. Carpenter's single denial of the UM for an orthopedic consultation on August 14, 2014, presents a genuine issue of material fact as to whether she was deliberately indifferent to Mr. Shaw's serious medical needs. As such it is recommended that the defendants' summary judgment motion be DENIED as to Dr. Carpenter on Mr. Shaw's deliberate indifference claim.

In summary, it is recommended that the defendants' summary judgment motion be GRANTED as to defendants Shedd, Badure, Bowers, and Regier, but DENIED as to defendants Ponto, Madsen and Carpenter on Mr. Shaw's deliberate indifference claim.

**E.    Interference With Mail**

In his complaint, Mr. Shaw indicates this claim is brought against defendants Ponto, Glaser, Carpenter and Bowers.  Docket 41, p. 23.  Mr. Shaw asserts he attempted to obtain medical records from outside medical providers in preparation for bringing this lawsuit, but that the defendants interfered with his efforts by confiscating his mail and not providing all of the records he requested from outside providers to him.  Docket 41, ¶¶ 161-175.

In their summary judgment submissions, the defendants have explained their procedure when an inmate wishes to obtain medical records for treatment received by an outside medical provider.  As the court understands Mr. Shaw's claim, he does not assert the defendants' procedure is unconstitutional; rather he asserts the defendants did not follow the procedure because he did not receive all or part of the records that he requested from outside providers.

The defendants explain that when an inmate wishes to view his medical records, the records which are provided to the inmate for review by health services <u>do not</u> include certain items.  Bowers Affidavit, Docket 66, ¶ 6; Schreurs Affidavit, Docket 57, ¶ 7.  For example, the dates and times of future appointments are removed.  <u>Id.</u>  This information is usually contained in the UMs.  <u>See e.g.</u> Docket 51-3, p. 14 (listing scheduled service date for the service

requested at CORE Orthopedics). Also, when an inmate wishes to obtain outside medical records, he does not get those records from prison health services. See Policy P-H-02A (Docket 51-1, pp. 87-90) (indicating that the release of medical records to detainees will not include records from third parties).[11]

Instead, the inmate must request outside records directly from the outside provider. This process is not an official policy, but it is described in Nurse Bowers' affidavit (Docket 66) at ¶ 13. Again, as the court understands Mr. Shaw's complaint, he does not contest the constitutionality of this procedure, but contends it was not followed in his case.[12] The procedure is as follows:

> When an inmate wishes to have a copy of his records from outside providers, he must first make that request directly to the outside provider. Then the inmate should kite Health Services to alert them the records will be coming. This is not policy but is a process that can alert Health Services to watch for the outside records in order to ensure they are provided to the patient. When the records arrive, they are reviewed for security purposes to remove dates and times of future appointments. The records are then turned over to the inmate. I do not recall any involvement in Inmate Shaw's request for records from outside providers. If I am involved in

---

[11] An inmate will also not routinely be provided copies of his mental health records. Instead, he must request those records from the mental health staff. See Policy P-H-02A, Docket 51-1, p. 88.

[12] This court recently extensively reviewed the question of the constitutionality of the "unwritten policy" regarding how an inmate should go about obtaining outside medical records in Cody v. McDonald, et. al, Civ. No. 14-4155 (RAL) (United States District Court, District of South Dakota). See Docket No. 115 in that case. This court's opinion finding the policy constitutional was adopted by the district court. See Docket No. 116 in that same case. The issue is currently on appeal to the United States Court of Appeals for the Eighth Circuit. See Docket 118 in that case.

requests for records, it is my practice to make a notation in the nursing notes. I have not located such a notation.

<u>See</u>, Bowers Affidavit, Docket 66, ¶ 13.

In his complaint, Mr. Shaw asserts that on November 18, 2015, he asked that "the prison" give him his mail from CORE. Docket 41, ¶ 171. In his response to the defendants' statement of undisputed facts (Docket 109, ¶ 11), Mr. Shaw asserts that he followed the procedure outlined in Ms. Bowers' affidavit. In his statement, Mr. Shaw says,

> Dispite (sic) Shaw following the rules as outlined . . . Plaintiff was denied these letters and never knew of their existence until Defendant filed for summary judgment. Shaw believes other mail sent to him has also been illegally withheld from him. Shaw believes Defendant's SMF # 11 to be contradictory to the Freedom of Information Act.[13] If CHS[14] has records of plaintiff within their files, Shaw should be able to access and view these records.

<u>See</u> Docket 109, pp. 5-6.

As noted above, the defendants against whom Mr. Shaw brings his interference with mail claim are defendants Ponto, Glaser, Carpenter and Bowers. Each of these defendants has, in support of the defendants' summary judgment motion, submitted an affidavit indicating either that (1) they have no involvement whatsoever in the process by which an inmate requests or receives outside mail/medical records (<u>See</u> Carpenter Affidavit, Docket 58, ¶¶ 7-8; Ponto Affidavit, Docket 60, ¶11; Glaser Affidavit, Docket 56, ¶¶ 15-17); or that (2) they had no involvement in Mr. Shaw's request to receive outside medical records in this particular instance (Bowers Affidavit, Docket 66, ¶ 13).

---

[13] Mr. Shaw did not make such a claim in his Fourth Amended Complaint.

[14] The court believes this to be an acronym for Correctional Health Services.

Mr. Shaw's general allegation that he complied with the process to receive his records but that "the prison" has withheld his mail from him is insufficient to defeat the defendants' motion for summary judgment.

Mr. Shaw has not sufficiently shown that the persons he claims are liable for this constitutional violation were personally involved. Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985). As a part of their summary judgment motion, each defendant alleged by Mr. Shaw as has having interfered his mail submitted affidavits disclaiming any knowledge of a proper request by Mr. Shaw to receive outside medical records. See affidavits cited in the above paragraph. Mr. Shaw did not meet this evidence with anything other than the vague allegations in his complaint. This is insufficient to defeat a properly supported motion for summary judgment. Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

For the reasons explained above, the court recommends that the defendants' motion for summary judgment be GRANTED in favor of all defendants against whom Mr. Shaw has alleged his interference with mail claim, because he has failed to show the policy itself was unconstitutional or that any of the defendants were involved in confiscating his mail.

As explained above, the two-pronged qualified immunity analysis asks whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right and if so, whether said right was clearly established at the

time of the violation.   <u>Saucier</u>, 533 U.S. at 201.  Those questions can be asked and answered in whichever order the court chooses.  <u>Pearson</u>, 555 U.S. at 236. However, if Mr. Shaw fails to show a constitutional violation, "there is no reason to reach the qualified immunity issue."  <u>Wright v. City of Philadelphia</u>, 409 F.3d 595, 600 (3d Cir. 2005).  Because Mr. Shaw has failed to show a constitutional violation as to the policy itself or that any named defendant was involved in confiscating his mail, therefore, the court does not reach the qualified immunity issue as to any of them.

**F.     Retaliation**

In his complaint, Mr. Shaw indicates this claim is brought against defendants Ponto, Bieber, and Bowers.  Docket 41, p. 23.  <u>See also</u>, Docket 41, ¶¶ 176-199.  Mr. Shaw asserts that after he requested medical records during a visit to health services on November 23, 2015, he was placed in the SHU for unknown reasons and that during his stay in the SHU, his cell was searched and that medical records and his legal work, among other things, were removed, and that some of these items were never returned to him.  Docket 41, ¶ 185.

Mr. Shaw alleges that during the visit to health services on November 23, he told personnel that he needed the medical records for "litigation purposes." Docket 41, ¶ 176.   <u>See also</u> Docket 51-1, p. 74 ("kite" dated November 20, 2015, from Mr. Shaw to health services indicating he needed to review medical records for purposes of preparing his amended complaint, with a deadline of December 15).   Mr. Shaw alleges his trip to the SHU, and the taking of his

medical records and legal work were done in retaliation for his declared intent to pursue his constitutional right to access the court.  Docket 41, ¶¶ 207-214.

"A prisoner's Eighth Amendment rights are violated if prison officials 'impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right.' "  <u>Meuir v. Greene County Jail Employees</u>, 487 F.3d 1115, 1119 (8th Cir. 2007).  <u>See also</u> <u>Haynes v. Stephenson</u>, 588 F.3d 1152, 115 (8th Cir. 2009).  A *prima facie* case of retaliatory discipline requires a plaintiff to show (1) that he exercised a constitutionally protected right, (2) that he was subsequently disciplined by prison officials, and (3) the motive for imposing the discipline was the exercise of the constitutional right.  <u>Id.</u>

To prevail on a claim of retaliation for violation of a First Amendment right, the plaintiff must show (1) that he engaged in a protected activity, (2) that the government defendant took adverse action against the plaintiff that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity.  <u>Santiago v. Blair</u>, 707 F.3d 984, 991 (8th Cir. 2013).

The third element of the *prima facie* case requires the plaintiff to show that, "but for" the retaliatory motive, the disciplinary action would not have been taken.  <u>Haynes</u>, 588 F.3d at 1156.  The "but for" test applies to the defendants' motive, not to causation.  <u>Beaulieu v. Ludeman</u>, 690 F.3d 1017, 1025 (8th Cir. 2012).  The "causal connection is generally a jury question, . . . [but] it can provide a basis for summary judgment when the question is so free

from doubt as to justify taking it from the jury." <u>Beaulieu</u>, 690 F.3d at 1025. Where the disciplinary action takes place "almost immediately" after a defendant learns of the protected constitutional activity, there is a sufficient nexus in time to show causation. <u>Haynes</u>, 588 F.3d at 1156-57. A span of three days between the alleged retaliation and the conclusion of the plaintiff's exercise of his constitutional rights was a sufficiently close nexus in time to stave off summary judgment. <u>Santiago</u>, 707 F.3d at 993. Where the allegedly retaliatory action takes place *before* a defendant knows that the plaintiff exercised a constitutional right, summary judgment in favor of the defendant is appropriate. <u>Beaulieu</u>, 690 F.3d at 1025-26.

In <u>Meuir</u>, the plaintiff had bleeding gums and toothaches for which he sought medicated mouthwash. <u>Meuir</u>, 487 F.3d at 1117. Defendants refused to provide the mouthwash, but instead gave him Tylenol and urged him to rinse his mouth with salt water. <u>Id.</u> After plaintiff's dental complaints continued, a visit to an outside dentist was scheduled; however, fearing that the dentist would pull all his teeth, the plaintiff refused to go. <u>Id.</u> at 1117-18. Thereafter, the jail officials refused to give the plaintiff free Tylenol for his toothaches, although the plaintiff could still obtain Tylenol from the commissary at his own expense. <u>Id.</u> at 1118. The plaintiff brought suit, alleging retaliatory discipline. <u>Id.</u> The case was dismissed on defendant's rationale that plaintiff's refusal to go to the dentist convinced defendants that his dental condition was not that serious after all. <u>Id.</u> at 1119.

In Haynes, a prisoner filed a grievance against a prison employee alleging the employee cursed at the prisoner and threatened him. Haynes, 588 F.3d at 1155. The employee responded by filing a disciplinary charge against the prisoner, alleging that the prisoner had filed a grievance on false charges. Id. This prompted prison officials to transfer the prisoner from his normal cell to a mosquito-infested, hot and humid cell where he received reduced shower and exercise privileges and could not visit the prison library. Id. The prisoner then filed a retaliatory discipline claim in court. Id. Defendants in the lawsuit argued that transfers to different cells did not constitute discipline, negating the second element of the *prima facie* case. Id. The court held that the filing of the disciplinary charge itself was sufficient to satisfy the second element. Id. at 1156.

In Cornell v. Woods, 69 F.3d 1383, 1386-88 (8th Cir. 1995), prison officials filed a disciplinary charge against a prisoner and the prisoner was transferred to a higher-security prison after he had cooperated with an internal affairs investigation at his prison implicating a prison guard. The prisoner then brought suit under § 1983 alleging that the defendants had disciplined him in retaliation for exercising his constitutional right to cooperate with the IA investigation. Id. at 1387. Although the court acknowledged that prisoners have no right to remain in a particular prison, and that prison officials may transfer a prisoner for any reason or no reason, the court held that defendants could not transfer a prisoner in retaliation for exercising a constitutional right. Id. at 1387-88. The court held that the plaintiff had a constitutional right to

cooperate with the internal prison investigation.  Id. at 1388.  If the cooperation in the investigation was the "but for" reason for the plaintiff's transfer to the more-secure prison, plaintiff made out a *prima facie* case of retaliatory discipline.  Id. at 1388-89.  If, however, the discipline or transfer was made because of "an actual violation of prison rules or regulations, then" the retaliatory discipline claim fails.  Id. at 1389; Santiago, 707 F.3d at 993.

Where a plaintiff engaged in behavioral infractions nine times in the month immediately preceding his transfer, and where transfers were appropriate to address behavioral problems, the plaintiff failed to prove that his exercise of his constitutional right was a "but for" cause of the transfer.  Beaulieu, 690 F.3d at 1026-27.

The "causal connection [between a discipline meted out and the previous exercise of a constitutional right] is generally a jury question, . . . [but] it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury."  Beaulieu, 690 F.3d at 1025.  Timing in this regard is extremely important:  where the disciplinary action takes place "almost immediately" after a defendant learns of the protected constitutional activity, there is a sufficient nexus in time to show causation.  Santiago, 707 F.3d at 993; Haynes, 588 F.3d at 1156-57.  Alternatively, where the allegedly retaliatory action takes place *before* a defendant even knows that the plaintiff exercised a constitutional right, summary judgment in favor of the defendant is appropriate.  Beaulieu, 690 F.3d at 1025-26.  Here, the court concludes that, under these facts, a genuine question of material fact exists as to whether a

causal connection exists between Mr. Shaw's exercise of a constitutional right and defendants' punishment of him. Thus, as to the first prong of qualified immunity analysis, whether the facts that plaintiff has shown make out a violation of a constitutional right, the court cannot hold as a matter of law that Mr. Shaw has failed to make such a showing.

The second prong of qualified immunity analysis asks whether that constitutional right was "clearly established" at the time of the official's acts. Saucier, 533 U.S. at 201. Here, the law had been clearly established for a couple of decades prior to defendants' actions in November, 2015. The Cornell decision, issued in 1995, held that even a penalty which a prisoner has no constitutional right to avoid cannot be imposed if the reason for the imposition of the penalty was retaliation for the exercise of a constitutional right. Cornell, 69 F.3d at 1387-88.

Of course, a defendant cannot be held individually liable for retaliation under § 1983 on the basis of vicarious liability. Webb v. Hedrick, 409 Fed. Appx. 33, 35 (8th Cir. 2010). Liability can only result from that defendant's personal participation in the constitutional deprivation. Id. Mr. Shaw names Associate Warden Ponto, Nurse Bowers, and Unit Manager Bieber in the retaliation count of is complaint. Docket 41, ¶¶176-190; 207-214.

Associate Warden Ponto's Affidavit (Docket 60, ¶ 4-5) along with other documentation in the record (Docket 51-4, p. 1) indicates that Ponto was involved in the decision to search Mr. Shaw's cell on November 23-24. Additionally, though Nurse Bowers did not request the search of Mr. Shaw's

cell, she was involved in the meetings which occurred to determine how Mr. Shaw's medical records turned up missing, and was present when Mr. Shaw allegedly admitted he stole them.  Bowers Affidavit, Docket 66, ¶ 10. Unit Manager Bieber did not order the search of Mr. Shaw's cell nor did he perform the search.  Bieber Affidavit, Docket 54, ¶9.  Mr. Bieber did not respond to a grievance Mr. Shaw submitted when he (Shaw) did not receive everything back after the November 24 cell search.  Id.  Mr. Bieber did, however, attend a small claims hearing later in state court to testify on behalf of the SDSP.  Id. at ¶11.

As explained above in the fact section of this opinion, though this lawsuit had not yet been *served* upon the named defendants, Mr. Shaw  had already *filed* his lawsuit and had notified health services as much via his November 20 "kite" and via his verbal notification during his November 23, 2015 visit to health services.

Further, the defendants cite the missing records from Mr. Shaw's health services file as their legitimate reason for Mr. Shaw's punishment, and argue therefore retaliation cannot be the "but for" cause of their actions on November 23, 2015.  The defendants' Docket 51-5 indicates the records were discovered missing on November 10, 2015, Docket 51-1, p. 81.  The defendants assert the discovery of the missing records triggered an investigation, and eventually the punishment which was meted out to Mr. Shaw on November 23.  Eventually, the defendants assert, Mr. Shaw admitted that he stole the records from his health services file during a chart review while the officer supervising him

(Smith) stepped away.  But it appears that Mr. Shaw's chart review under the watch of Officer Smith, during which Mr. Shaw allegedly later admitted to stealing the records, did not occur until December 4, 2015.  This apparent discrepancy calls into question the version of facts presented by the defendants, and raises the specter of the possibility that Mr. Shaw was, on November 23, 2015, punished for exercising his constitutional right to file a lawsuit.

Based on the facts and the law present in the record, the court concludes that summary judgment may not issue in favor of defendants on their claim that they are entitled to qualified immunity on Mr. Shaw's retaliation claim.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends court that defendants' motion for summary judgment [Docket 50] be GRANTED in part and DENIED in part as follows:

As to Mr. Shaw's deliberate indifference to serious medical need claim, the defendant's motion for summary judgment should be GRANTED as to all defendants except defendants Ponto, Madsen, and Carpenter;

As to Mr. Shaw's interference with mail claim, the defendants' motion for summary judgment should be GRANTED in its entirety;

As to Mr. Shaw's retaliation claim, the defendants' motion for summary judgment should be DENIED in its entirety.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 31st day of August, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge