UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JAMES ELMER SHAW,<br><br>    Plaintiff,<br><br>vs.<br><br>TROY PONTO, ASSOCIATE WARDEN, INDIVIDUAL AND OFFICIAL CAPACITY; AL MADSON, UNIT MANAGER, INDIVIDUAL AND OFFICIAL CAPACITY; SAM BADURE, UNIT MANAGER, INDIVIDUAL AND OFFICIAL CAPACITY; DERICK BIEBER, UNIT MANAGER, INDIVIDUAL AND OFFICIAL CAPACITY; JACOB GLASIER, UNIT COORDINATOR, INDIVIDUAL AND OFFICIAL CAPACITY; DR. MARY CARPENTER, M.D. (HEALTH SERVICES), INDIVIDUAL AND OFFICIAL CAPACITY; DR. EUGENE REGIER, MD, INDIVIDUAL AND OFFICIAL CAPACITY; HEATHER BOWERS, RN (HEATH SERVICES), INDIVIDUAL AND OFFICIAL CAPACITY; AND AUDREY SHEDD, HEAD REGISTERED NURSE, INDIVIDUAL AND OFFICIAL CAPACITY;<br><br>    Defendants. | 4:15-CV-04121-KES<br><br><br>ORDER ADOPTING THE REPORT AND RECOMMENDATION IN PART AND REJECTING IT IN PART |

  Plaintiff, James Elmer Shaw, filed this lawsuit under 42 U.S.C. § 1983. Defendants move for summary judgment. Docket 50. The case was referred to the magistrate judge under 28 U.S.C. § 636(b)(1)(B) for a report and recommendation on defendants' motion for summary judgment.

On August 31, 2017, the magistrate judge submitted her report and recommended that defendants' motion for summary judgment be denied in part and granted in part. The magistrate judge recommended that the court deny summary judgment on Shaw's claim for deliberate indifference to serious medical need against defendants Ponto, Madsen, and Carpenter and to deny summary judgment on Shaw's retaliation claim against defendants Ponto, Bieber, and Bowers. Docket 114 at 74. The magistrate judge further recommended that the court grant summary judgment on Shaw's remaining claims. *Id.*

Defendants filed objections to the magistrate judge's Report and Recommendation on September 13, 2017. Docket 115. Defendants objected to the magistrate judge's recommendation to deny summary judgment as to the deliberate indifference and retaliation claims. *Id.* Shaw responded to defendants' objections. Docket 117.

**FACTUAL BACKGROUND**

Defendants do not object to the magistrate judge's statement of facts. A full recitation of the facts can be found in the Report and Recommendation. Docket 114. Here, the court summarizes the facts relevant to Shaw's objections to the report and recommendation:

Plaintiff, James Elmer Shaw, is in the custody of the South Dakota Department of Corrections and housed at the South Dakota State Penitentiary. Beginning in 2002, Shaw began to receive medical treatment for pain in his right knee. Docket 51-2 at 1-2. Between 2002 and 2008, Shaw continued to

visit prison health services for pain in his right knee, and it was eventually discovered that Shaw had a "prominent" osteochondroma[1] growth on his right tibia. Docket 51-1 at 1-5. In 2008, Dr. Eugene Regier, in prison health services, decided to submit a Utilization Management[2] (UM) for an orthopedic consult because it appeared that the osteochondroma was becoming more symptomatic. *Id.* at 10-11. Dr. Regier made the UM request for an orthopedic consult on April 18, 2008, and it was approved on April 21, 2008. Docket 51-3 at 1.

Shaw saw Dr. Evan Hermanson on May 5, 2008. Docket 51-2 at 7-8. Prior to his appointment with Dr. Hermanson, Shaw underwent an MRI of his right knee on April 28, 2008. *Id.* at 3-4. The MRI revealed a complex tear of the lateral meniscus in addition to the osteochondroma, which extended over the tibia and fibula, or possibly two osteochondromas grown together. *Id.* Dr. Hermanson's note states:

> Right lateral knee pain and meniscal tear, but the pain seems to be associated with osteochondroma and overlying bursa. I discussed this with him. Although he has a meniscal tear I do not think taking out the meniscus is going to improve his knee pain at all,

---

[1] An osteochondroma is an overgrowth of cartilage and bone that happens at the end of the bone near the growth plate. Most often, it affects the long bones in the leg, the pelvis, or the shoulder blade.
Osteochondroma is the most common non-cancerous bone growth. It most often occurs between ages 10 and 30. It affects males and females equally. The most common symptoms of osteochondroma are a hard mass that is painless and does not move, lower than normal height for one's age, one leg or arm that is shorter than the other, pressure or irritation with exercise, and soreness of nearby muscles.
http://www.hopkinsmedicine.org/healthlibrary/conditions/bone_disorders/osteochondroma_85,p00125. (last checked September 18, 2017).
[2] UM requests refer to requests for medical care from outside providers.

> since his pain is further distal than the actual joint. If he wanted to pursue having a osteochondroma [sic] excised in hopes that this would improve his pain than [sic] he would need to be referred to an orthopedic tumor surgeon. I discussed trying to coordinate that, but he does not to proceed with what would likely be a large undertaking to remove that osteochondroma.

*Id.* at 7. Dr. Hermanson recommended Ibuprofen 600 milligrams three times a day for pain. *Id.* at 8.

Between 2008 and 2012, Shaw continued to have pain in his right knee and visited prison health services numerous times. During that time, Shaw received a cortisone shot, X-rays, orders for "med ice", and numerous other medical orders and restrictions. Docket 51-1; Docket 51-2. Finally, on December 12, 2012, Shaw saw Dr. Jeffrey Kalo. Docket 51-2 at 18. Dr. Kalo recommended an MRI of the right knee to assess the osteochondroma and the meniscal tear, and Dr. Kalo indicated that Shaw would need a knee scope after the MRI. *Id.*

On December 13, 2012, Dr. Regier submitted a UM for the MRI suggested by Dr. Kalo. Docket 51-3 at 12. Dr. Mary Carpenter approved the UM on December 26, 2013. *Id.* The MRI was performed on January 2, 2013, and revealed (1) a new anterior cruciate ligament (ACL) tear; (2) a new tear of the medial meniscus posterior horn; (3) increased/new cartilage defects in the medial and lateral femorotibial compartments; (4) unchanged tear of the lateral meniscus body as well as partial extrusion; (5) unchanged osteochandroma; and (6) Baker's cyst with more intrabursal bodies. Docket 51-2 at 20. Shaw then had another appointment with Dr. Kalo on April 10, 2013. Docket 51-2 at

4

21. Based on the MRI, Dr. Kalo believed the best option was a right knee arthroscopy. *Id.* On May 9, 2013, Dr. Regier submitted a UM for Shaw to obtain the surgery recommended by Dr. Kalo. Docket 51-3 at 14. Dr. Carpenter approved this UM on May 16, 2013, and Dr. Kalo performed the surgery on June 14, 2013. Docket 51-2 at 22-24. Following the surgery, Shaw was provided a knee brace and directed not to engage in sports. Docket 51-2 at 26.

On March 13, 2014, Shaw visited health services complaining of pain in his left knee and requested an extension of pain meds. Docket 51-1 at 42. On July 17, 2014, PA Ryan Manson submitted a UM for an MRI of Shaw's left knee. Docket 51-3 at 19. Dr. Carpenter approved this UM on July 19, 2014. *Id.* The MRI of Shaw's left knee was performed on August 6, 2014 and showed:

> (1) trace joint effusion and moderate sized Baker's cyst; (2) complex macerated tearing of most of the lateral meniscus with little intact meniscus remaining; (3) chronic tear of the ACL; (4) question horizontal tear of the posterior horn of the medial meniscus; and (5) cartilage defects, fairly significant of the lateral femoral tibial compartment and mild degenerative changes of the patellofemoral compartment.

Docket 51-1 at 46.

In response to the MRI, PA Manson submitted a UM for a left knee consult with CORE Orthopedics on August 12, 2014. Docket 51-3 at 21. On August 29, 2014, Dr. Carpenter denied this UM stating "chronic degenerative condition." *Id.* On Decmber 15, 2014, PA Manson again submitted a UM for Shaw to see Dr. Kalo. *Id.* at 20. Dr. Carpenter approved the UM on the same day it was submitted. *Id.* Shaw saw Dr. Kalo on January 15, 2015. Docket 51-2 at 31. Dr. Kalo ordered X-rays and reviewed the MRI of the left knee. *Id.* at 31.

5

He assessed a grade 3 ACL sprain on the left knee, a lateral tear of the meniscus, and patellofemoral arthrosis. *Id.* Dr. Kalo discussed treatment options with Shaw and recommended surgery. *Id.* On January 15, 2015, PA Manson submitted a UM for the surgery and Dr. Carpenter approved it on February 2, 2015. Docket 51-3 at 22. Dr. Kalo performed the surgery on March 9, 2015. Docket 51-2 at 27-30. On the same day, a medical order was entered stating that, following his surgery, Shaw was to ice his left knee as tolerated, keep his left knee elevated above his heart, take Lortab[3] for five days, and begin knee exercises 48 hours post-surgery. Docket 51-1 at 50.

    Shaw asserts that the medical orders were not followed by Madsen and Ponto. Docket 41 ¶¶ 85-101. Specifically, that he was not provided medical ice until three days after the surgery and he was forced to return to the SHU and then to his cell with no accommodation for medical ice or elevation of his knee. *Id.* Defendants assert Shaw was sent to the SHU after his surgery because he refused his housing assignment when he was not given a handicap cell. Docket 56 ¶ 12; Docket 59 ¶ 7. While Shaw was in the SHU, he requested ice, pain medication, and the ability to elevate his knee but Madsen refused. Docket 52 ¶ 13; Docket 41 ¶¶ 67, 82. Madsen refused these items because he was not aware of Shaw's medical orders even though medical orders follow an inmate when they go to the SHU. Docket 52 ¶ 13; Docket 66 ¶ 15. After Shaw was released from the SHU on March 11, 2015, Shaw alleges he begged Associate Warden Ponto for help, but Ponto did nothing. Docket 41 ¶ 93-109.

---

[3] Lortab is the pain medication prescribed to Shaw.

6

On March 18, 2015, Dr. James Schaeffer from prison health submitted a UM for an urgent follow up for Shaw with Dr. Kalo due to a possible infection at the surgical site on Shaw's left knee. Docket 51-3 at 23. Dr. Carpenter did not approve the UM until March 23, 2015, but Dr. Kalo saw Shaw on March 19. Docket 51-2 at 32. Shaw believed his knee was infected but Dr. Kalo did not find an infection and only found an expected amount of swelling and warmth following surgery. *Id.* Dr. Kalo recommended that Shaw continue to ice and use a knee brace. *Id.* Shaw told prison health nursing staff that recovery went "okay for the most part however pain in the left knee continues." Docket 51-1 at 56-58.

Defendants explained that when an inmate requests medical records, he does not obtain access to outside medical records during a medical records review. Docket 51-1 at 87-90. Instead, the inmate's medical file is pulled and prepared for review by removing any information the inmate is not allowed to access, such as outside records, mental health records, UM requests, and dates of future appointments. *Id.* To obtain outside medical records, an inmate must request them directly from the outside provider. *Id.* at 87.

In November 2015, Shaw made several requests to review his medical records. Docket 109-28; Docket 51-5. At that time, Shaw had already filed his complaint in this action but it had not been served on any of the named defendants. On November 23, 2015, Shaw was placed in the SHU while his cell was searched for missing medical records. On December 17, 2015, non-

7

defendant Jessica Schreurs authored a document that was placed in Shaw's medical file. Docket 57 ¶ 5. The dictation in Shaw's file stated as follows:

> Late entry:
>
> 11/09/15 the patient kited requesting to review his medical records. He submitted repeated requests to review his medical records on 11/13/15, 11/16/15, 11/18/15, and 11/20/15. On 11/10/15 Kristina Wiersma with medical records discovered the patients [sic] chart was out of order with random papers, specifically mental health papers and outside records pulled to the front of the chart.
>
> 11/21/15 Heather Bowers RN made aware that the provider dictations are unable to be located. Over the next week Heather Bowers RN, Kristine Wiersma Medical Records and Rosie Rand went through all four of the patients [sic] chart attempting to locate the missing records. Jessie Rand searched Jameson health services to see if the patient had an additional thinned chart down there. She was unable to locate an additional chart.
>
> 11/24/15 I was approached by Heather Bowers RN to determine what the next step would be. I called Unit Manager Dittmanson and asked that a cell search would be completed on Mr. Shaw in an attempt to locate the missing records at 1400. At approximately 1545 SCO Howe brought me a folder contained 102 pages of medical records. There were 9 original signed provider dictations from the following dates 08/02/10, 08/24/11, 10/2/12, 11/7/12 [sic], 7/3/13, 9/3/13, 7/10/14, 8/28/14, 12/11/14, and one original UM for an orthopedic surgical consult from 2/6/10. The original documents were on #11 pages of paper.
>
> 11/25/15 I approached AW Ponto requesting that special security complete an investigation into how the patient obtained original internal records.
>
> 12/01/15 AW Ponto notified this writer that the patient reports he obtained all the confiscated records from an outside provider. I notified AW Ponto that this was not a possibility as the original

documents were internal provider documents that were signed. The outside provider would not have had access to these records.

12/01/15 Notified Kayla Tinker and Melissa Johnson of the situation who advised me clearly indicate what records were original and to develop timeline of events.

12/02/15 Met with AW Ponto, Heather Bowers RN and Mr. Shaw. Patient reports he received the documents from Nurse Melissa. Informed Patient that Nurse Melissa has not worked for the department in several years and the most recent original document was dated from 12/2014 and that I needed to know how he obtained the records. He then reports that medical provided him with the chart to review in the waiting room at his request with the officer watching him. He reports that SCO Smith had to step away and he took the records.

12/17/15 Called patient to health services to return #91 non original documents to patient. I informed him that I was returning all non-original documents but that he would not receive the originals back. Patient verbalized understanding. He reports he has more original documents in his cell. I requested that the patient return all original documents. He brought up the following: original provider dictation from 01/03/2007, original provider dictation 07/02/2009. This was a total of 5 pages. I offered the patient to provide him copies of these records. Notified AW Ponto of the additional original records obtained from the patient.

Docket 51-5.

Shaw denies that he stole the medical records and denies that he admitted stealing the records. Docket 109 14-19. Also, Shaw's medical chart review under the supervision of SCO Smith did not occur until December 4, 2015. Docket 51-1 at 81.

## LEGAL STANDARD

Review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure. Under 28 U.S.C. § 636(b)(1), the court reviews de novo any objections that are timely made and specific. *See* Fed. R. Civ. P. 72(b) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to").

Pro se filings must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). Even with this construction, "a pro se [filing] must contain specific facts supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *Ellis v. City of Minneapolis*, 518 F. App'x 502, 504 (8th Cir. 2013). Summary judgment on all or part of a claim is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Craig*, 144 F.3d 593, 595 (8th Cir. 1998). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of*

*Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "Further, 'the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, the dispute must be outcome determinative under prevailing law.' " *Id.* (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)). The facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## DISCUSSION

Defendants object to the magistrate judge's recommendation that summary judgment not issue in favor of Madsen, Ponto, or Dr. Carpenter on Shaw's claim for deliberate indifference. Docket 115 at 2. Defendants also object to the magistrate judge's recommendation that summary judgment not issue in favor of Ponto, Bieber, and Bowers on Shaw's claim for retaliation. *Id.* at 10.

### I. Deliberate Indifference

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. Amend. VIII. "Deliberate indifference to serious medical needs of prisoners constitutes "the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to

11

the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05. Shaw must show that he suffered objectively serious medical needs and that defendant actually knew of but deliberately disregarded those needs. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

### A. UM Madsen and AW Ponto

First, the court must analyze whether Shaw had a serious medical need. "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). Here, Shaw had knee surgery on his left knee on March 9, 2015. Upon returning from surgery, Dr. Kalo ordered that Shaw receive pain medication until March 14, 2015, ice his knee as tolerated, and keep his knee elevated above his heart. Docket 51-1 at 50. Thus, the court finds that Shaw had a serious medical need that was diagnosed by a physician as requiring treatment.

Second, the court must determine whether Madsen and Ponto were deliberately indifferent to Shaw's medical needs. There are multiple ways an inmate can show deliberate indifference. One way is to show that the "defendant intentionally delayed or denied access to medical care." *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015). Shaw alleges that Madsen refused to comply with medical orders to give Shaw ice, elevation, and pain medication after Shaw's March 9 left knee surgery. Docket 41 ¶¶ 82-83. Madsen admits

12

that he refused to provide Shaw with ice, elevation, and pain meds. Docket 52. But he argues that he did not know about the medical orders (Docket 51 at 19), that there was a recommendation for ice and not a medical order for ice (Docket 51 at 19), and that Shaw was given his prescribed medication (Docket 115 at 4). As to Madsen's knowledge of the orders, Bowers confirms that medical orders follow the prisoner, even into the SHU. Docket 66 ¶ 14. Also, Shaw claims he requested ice, elevation, and pain medication directly from Madsen. Docket 41 ¶¶ 82-83. Because it is proper procedure for the orders to follow an inmate into the SHU and Shaw alleges he specifically asked Madsen for treatment, there is a question of fact as to whether Madsen did know about the medical orders.

Defendants also argue that the language in the order stating "ice to [left] knee as tolerated" is not consistent with past language in medical orders, so the "order" for ice was actually a recommendation. That argument is irrelevant because Madsen claims he did not give Shaw ice because he did not know about the order—not because he saw the order and misunderstood the instruction. Thus, any argument as to the ambiguity of the language now is not relevant to Madsen's knowledge back in March of 2015. And as to defendants' point that Shaw was given his pain medication, medical administration records indicate that Shaw was given pain medication while he was in the SHU. Docket 116-1. But Shaw's primary allegation is that Madsen denied Shaw the ability to ice and elevate his knee. Docket 41 ¶¶ 82-88. Because there are facts to support the contention that Madsen knew about the medical order and denied

13

Shaw the ability to ice and elevate his knee, the court finds that there is a question of fact as to whether Madsen was deliberately indifferent to Shaw's medical needs.

Defendants also object to the magistrate judge's recommendation that summary judgment not be granted in favor of Ponto on Shaw's claim for deliberate indifference because Ponto did not know about Shaw's medical needs until March 16, 2015. Docket 115 at 6. But Shaw alleges in his Fourth Amended Complaint that on March 11, 2015, after Shaw was released from the SHU, Shaw went to Ponto's office and told him he had a medical emergency but Ponto ignored his requests. Docket 41 at 11-12. Thus, there is a question of fact for the jury as to whether Ponto denied Shaw access to medical treatment.

### B. Dr. Carpenter

Again, the court must first analyze whether Shaw had a serious medical need. To show a serious medical need, Shaw must demonstrate a medical need that has "been diagnosed by a physician as requiring treatment," or was "so obvious a layperson would easily recognize the necessity for a doctor's attention." *Coleman*, 114 F.3d at 784. Here, on August 6, 2014, Shaw's MRI revealed that he had a moderate-sized Baker's cyst, tearing in the meniscus, "a chronic tear of the ACL," and cartilage defects. *See* Docket 51-1 at 46. Because Dr. Carpenter denied the UM request for an orthopedic consultation, Shaw did not have the opportunity to receive a doctor's order on treatment for his left knee. But, viewing the facts in the light most favorable to Shaw, this court finds that tearing in the meniscus and a "chronic tear of the ACL" is a serious

14

medical need that a layperson would easily recognize as requiring a doctor's attention.

Next, the court must analyze whether Dr. Carpenter was deliberately indifferent to Shaw's medical needs. Shaw alleges that Dr. Carpenter was deliberately indifferent to his medical need because she denied the first UM request for an orthopedic consultation on his left knee. But Dr. Carpenter approved a UM for an orthopedic consultation three months later and approved the UM request for the knee surgery. Docket 51-3 at 21. Thus, Shaw's claim is for a delay in medical treatment as opposed to a denial of treatment. To prove a claim of deliberate indifference for a delay in medical treatment, the record must contain verifying medical evidence that a delay resulted in a detrimental effect. *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997). Here, Shaw has not presented any evidence in the record to indicate that the three-month delay in receiving an orthopedic consultation resulted in a detrimental effect. Thus, there is no issue of material fact and summary judgment is granted in favor of Dr. Carpenter.

## II.     Retaliation

"A prisoner's Eighth Amendment rights are violated if prison officials 'impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right.' " *Meuir v. Greene Cty. Jail Emps.*, 487 F.3d 1115, 1119 (8th Cir. 2007) (quoting *Goff v. Burton*, 7 F.3d 734, 738 (8th Cir. 1993)). "To prevail on a § 1983 claim for retaliation in violation of the First Amendment, [the plaintiff] must demonstrate (1) that he engaged in a

protected activity; (2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity." *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013) (citing *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).

Shaw states that on November 23, 2015, he visited health services and told personnel that he needed his medical records for "litigation purposes." Docket 41 ¶ 176. Shaw alleges that, in retaliation for his stated intention to pursue his constitutional right to access the court, he was placed in the SHU, his cell was searched, and medical records and legal work were taken from him and never returned. Docket 41 ¶ 185.

"In the prison context, we have observed that prison officials are prohibited from 'punishing an inmate because he exercises his constitutional right of access to the courts.' " *Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012) (quoting *Sisneros v. Nix*, 95 F.3d 749, 751 (8th Cir. 1996)). The filing of a lawsuit is a constitutionally protected activity under the First Amendment. *Santiago*, 707 F.3d at 991-92. Thus, Shaw satisfies the first prong.

To satisfy the second prong, Shaw must not only show that defendants took an adverse action, but that the action "would chill a person of ordinary firmness from continuing in the [protected] activity." *Revels*, 382 F.3d at 876. The Eighth Circuit has adopted the "ordinary firmness" requirement for First Amendment claims of retaliation. *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir.

2007). The "ordinary-firmness" test is an objective test. *Santiago*, 707 F.3d at 992.

In *Santiago*, the Eighth Circuit found that "a reasonable jury could find that threats of death, issued by a correctional officer tasked with guarding a prisoner's segregated cell, would chill a prisoner of ordinary firmness." *Id.* In *Revels*, the Eighth Circuit found that the plaintiff failed to show the defendant took an adverse action because the plaintiff did not produce any evidence and could not rest on bare allegations. *Revels*, 382 F.3d at 876-77.

Here, there is no evidence in the record to show that Bowers took an adverse action against Shaw. Shaw alleges that Bowers initiated the investigation to find the missing medical records (Docket 108 at 15) and Bowers states that she was present in a meeting where Shaw allegedly admitted to stealing his medical records (Docket 55 at 2). But Bowers did not order the search of Shaw's cell. Bowers' mere presence at a meeting where Shaw was questioned about the medical records is not an adverse action, and even if it were, would not chill an ordinary person from taking part in a protected activity.

Also, there is no evidence indicating that Bieber took an adverse action against Shaw. Shaw alleges that Bieber prevented Shaw from obtaining his property that was taken during the November 23 search by intervening in the grievance process (Docket 108 at 15), and Bieber states that he testified for the government at the small claims hearing where Shaw brought a claim against the Warden to retrieve items taken from his cell during the November 23

17

search. Docket 54. But the evidence indicates that Bieber did not handle Shaw's filed grievance to retrieve his property after the November 23 search. *See* Docket 51-4 at 5. Bieber did testify at the small claims proceeding, but Shaw does not allege that Bieber's testimony was an adverse act. Docket 108 at 15. Bieber was not involved in the search of Shaw's cell or in the decision to place Shaw in the SHU. *Id.* Thus, there is no evidence to support that either Bowers or Bieber took an adverse action against Shaw and no question for the fact finder, so both Bowers and Bieber are entitled to summary judgment on the retaliation claim.

But there is evidence to support Shaw's claim that Ponto took an adverse action against Shaw because the evidence indicates that Ponto ordered the search of the Shaw's cell. Docket 51-4 at 1. The court finds that a cell search paired with being placed in the SHU could be considered an adverse action that would chill an ordinary person from taking part in a protected activity. To satisfy the third prong of the test "the plaintiff must show the official took the adverse action because the plaintiff engaged in the protected speech." *Revels*, 382 F.3d at 876. "The causal connection is generally a jury question, . . . it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Id.* Where the disciplinary action takes place "almost immediately" after a defendant learns of the protected activity, there is a sufficient nexus in time to show causation. *Haynes v. Stephenson*, 588 F.3d 1152, 1156-57 (8th Cir. 2009).

In *Haynes*, the Eighth Circuit found that the plaintiff had satisfied the causal connection prong. *Haynes*, 588 F.3d at 1157. Almost immediately after the prisoner filed a grievance against defendant, the defendant filed a disciplinary report against the prisoner. *Id.* at 1156-57. The defendant wrote in the disciplinary report that he was filing the report because plaintiff's grievance was false. *Id.* at 1157. Thus, the Court found that the district court did not err in concluding that, but for plaintiff's grievance, defendant would not have filed the disciplinary report. *Id.*

Here, defendants allege that Shaw's cell was searched because he was suspected of stealing his medical records and he was placed in the SHU for investigatory purposes. The evidence defendants rely on shows that on November 24, 2015, Shaw's cell was searched and the search produced missing medical records from Shaw's chart. Docket 51-5. Then, on December 12, 2015, Ponto, Bowers, and Schreuers met with Shaw, and Shaw admitted to stealing the medical records while completing a chart review under the supervision of SCO Smith. *Id.* But Shaw's chart review under the supervision of SCO Smith did not occur until December 4, 2015. Docket 51-1 at 81. Thus, this discrepancy raises a question of fact as to whether defendants' proffered explanation for disciplining Shaw is accurate. Additionally, evidence shows that Shaw told health services on November 20, 2015—prior to being placed in the SHU—that he was filing an amended complaint. Docket 51-1 at 74. Three days later, Shaw was placed in the SHU and his cell was searched. Docket 60 ¶¶ 1-2. So even though none of the defendants had been served with the summons

and complaint, there is reason to believe that the defendants were aware of the lawsuit shortly before Shaw was disciplined. Thus, this court finds that there is a question of fact for the jury to determine whether Ponto retaliated against Shaw for exercising his constitutional right to the courts.

IT IS ORDERED,

1. Defendants' motion for summary judgment (Docket 50) is granted on all claims as to all defendants except as follows:

    a. On Shaw's claim for deliberate indifference to a serious medical need as to Madsen and Ponto; and

    b. On Shaw's retaliation claim as to Ponto.

2. The Magistrate Judge's Report and Recommendation is adopted in part and rejected in part as referenced herein.

DATED this 29th day of September, 2017.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE